A.H., a minor, BY his father and next friend, Keith HOLZMUELLER, Plaintiff-Appellant,

v.

ILLINOIS HIGH SCHOOL ASSOCIATION, Defendant-Appellee.

No. 17-2456

United States Court of Appeals, Seventh Circuit.

Argued November 6, 2017

Decided February 2, 2018

Louis E. Fogel, Attorney, JENNER & BLOCK LLP, Chicago, IL, Devi M. Rao, Attorney, JENNER & BLOCK LLP, Washington, DC, for Plaintiff-Appellant.

Matthew S. Hefflefinger, Craig L. Unrath, Jessica R. Sarff, Attorneys, HEYL, ROYSTER, VOELKER & ALLEN, Peoria, IL, Tyler James Pratt, Attorney, HEYL, ROYSTER, VOELKER & ALLEN, Champaign, IL, for Defendant-Appellee.

Before Bauer, Kanne, and Rovner, Circuit Judges.

Bauer, Circuit Judge.

A.H., a senior at Evanston Township High School, is a member of the school's track and field team despite his physical limitations from spastic quadriplegia related to cerebral palsy. During his junior year, he requested that the Illinois High School Association (IHSA) create a separate division with different time standards for para-ambulatory runners in the Sectional and State championship track meets, as well as the annual 5K Road Race. The IHSA denied these requests, and A.H. filed this suit seeking injunctive relief under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a); and, Titles II and III

of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12132, 12182(a). The district court granted summary judgment in favor of the IHSA, finding that A.H.'s requests were not reasonable accommodations under the Rehabilitation Act and the ADA. We affirm.

## I. BACKGROUND

Despite being born with spastic quadriplegia related to cerebral palsy, A.H. has been a three-sport athlete in cross country, swimming, and track and field at Evanston Township High School since his freshman year. A.H. is classified by the International Paralympic Committee (IPC) as a T-36 disabled athlete, meaning that his disability impairs his muscular control, balance, coordination, and range of motion. In particular, A.H. has limited coordination in both his legs and arms, and has limited range of motion in his hips, knees, and ankles. Thus, his disability hinders crucial parts of his body that are essential for running.

A.H. is a full member of the track and field team, and he has never been prevented by his school or the IHSA from being on the team or participating at individual school meets. In fact, A.H. has never missed a track meet in his high school career. He is fully embraced and respected by both his coaches and teammates. Moreover, A.H. is considered an elite athlete within the disabled athletic community, as he competed at the U.S. Paralympic Trials in 2016.

The IHSA is a not-for-profit voluntary association which organizes and regulates interscholastic high school athletic events throughout Illinois. It consists of 810 public and private member high schools, more than 90% of the high schools in Illinois. The IHSA's Board of Directors is comprised of ten principals from its member high schools who have the final authority on the overall operations and rules; an Executive Director of the IHSA oversees the day-to-day operations.

The Executive Director has complete authority to decide accommodation requests, which can be brought by member schools, or by an individual. There is no published criteria the Executive Director consults when evaluating such requests. The Executive Director's ruling on an accommodation request can be appealed to the ten-member Board, which will hold a hearing with the student-athlete and other relevant parties.

The IHSA maintains an "Accommodation Policy for Students with Disabilities," which provides:

> It is the policy of the IHSA to provide students with disabilities full and equal opportunities to be integrated in IHSA interscholastic sports and activities whenever possible. IHSA recognizes and adopts the definition of disability as provided within the [ADA]. The IHSA will not discriminate against students with disabilities on the basis of disability in its services, programs, or activities.

In this vein, the IHSA has implemented events and divisions within particular sports for student-athletes with disabilities, such as a para-ambulatory division at swim meets, and a wheelchair division at track and field meets.

However, the IHSA does not have a para-ambulatory division for runners like A.H. in the track and field meets it regulates. While the IHSA does not organize or regulate individual school meets throughout the track and field season, it does manage the two most important track meets: the Sectional meet and the State championship meet. In order to qualify for the State championship meet ("State"), a runner must place first or second in their event, or attain a particular qualifying time

at the Sectional meet. Runners who compete at State can achieve points for their team, which are accumulated to determine which team wins the overall State championship. The IHSA does not preclude any runner from participating at Sectionals, as individual track and field teams determine who runs in the events. In fact, A.H. ran the 1600 meter race for his team at Sectionals in the Spring of 2017.

By design, the State qualifying times established by the IHSA at the Sectional meet preclude thousands of able-bodied runners from qualifying for State each year. Approximately 10% of all runners on IHSA-member track and field teams qualify for State.

A.H. cannot attain any of the qualifying times for State, and it is undisputed that world record holders in the T-36 classification would be unable to achieve any of the qualifying times. Thus, on September 26, 2015, A.H., on an individual basis, submitted three accommodation requests to the IHSA: (1) that the IHSA create separate para-ambulatory time standards for the Sectional and State meets in the 100, 200, 400, and 800 meter races; (2) that the IHSA create a para-ambulatory division in the annual 5K Road Race; and, (3) that A.H. be allowed to use a modified starting block in the 100, 200, and 400 races. A.H. suggested in the first accommodation request that IHSA adopt the Louisiana High School Athletic Association (LHSAA) qualifying times for para-ambulatory runners. A.H. has recorded personal best times in the 100, 200, 400, and 800 that would qualify him for State under the LHSAA qualifying times.

On October 8, 2015, the Executive Director granted A.H.'s third request for a modified starting block; however, he denied the first two requests, finding that they were not reasonable but that A.H. "currently has the same opportunity to compete in track and field as his nondisabled peers."

The Executive Director relied on guidance from the U.S. Department of Education Office of Civil Rights, which noted in a letter to school officials that students with disabilities must be provided access to extracurricular activities, but that schools were under no obligation to create separate or different activities for the disabled.

On October 25, 2015, A.H. appealed the Executive Director's ruling. The Board held a hearing on December 14, 2015, and sustained the Executive Director's decision to deny the requests. The Board noted that A.H. was already part of the team, and that being a part of the team was a greater intangible benefit than participating at State. Moreover, the Board emphasized that the IHSA's goal is to integrate disabled athletes with able-bodied athletes rather than separating them. Finally, the Board concluded that granting A.H.'s request would provide him an unfair competitive advantage because he would have a greater opportunity to advance to State and earn points for his team.

A.H. filed a lawsuit on February 4, 2016, seeking injunctive relief to compel the IHSA to adopt the separate para-ambulatory qualifying times and divisions at the Sectional and State track meets, as well as the Road Race. The complaint alleged that IHSA's refusal to adopt these accommodations amounted to impermissible discrimination against disabled individuals under Section 504 of the Rehabilitation Act, and Titles II and III of the ADA.

After discovery, the district court granted summary judgment in favor of the IHSA. The court found that A.H. could not show that the alleged discrimination had occurred on the basis or by reason of his disability. The court also concluded that even if A.H. had presented such evidence,

his accommodation requests were not reasonable, as a matter of law, because they would fundamentally alter the nature of the IHSA's track and field competitions.

## II. DISCUSSION

■ We review a district court's grant of summary judgment *de novo. Steimel v. Wernert,* 823 F.3d 902, 910 (7th Cir. 2016). Summary judgment is appropriate if the moving party shows there is "no genuine dispute as to any material fact," and that he is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(a).

■ The relevant provisions and implementing regulations of the Rehabilitation Act and the ADA are "materially identical." *Steimel,* 823 F.3d at 909 (quoting *Bruggeman ex. rel. Bruggeman v. Blagojevich,* 324 F.3d 906, 912 (7th Cir. 2003) ). As a result, "courts construe and apply them in a consistent manner," and our evaluation of A.H.'s claims under both require the same analysis. *Radaszewski ex rel. Radaszewski v. Maram,* 383 F.3d 599, 607 (7th Cir. 2004).

The Rehabilitation Act and the ADA provide expansive protections from discrimination for individuals with disabilities. Section 504 of the Rehabilitation Act provides that no disabled individuals "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29. U.S.C. § 794(a). The Rehabilitation Act's prohibition on disability discrimination was greatly expanded by the ADA. Titles II and III of the ADA expand protections against discrimination for disabled individuals in any public entity, as well as places of public accommodation. *See* 42 U.S.C. § 12132 (no disabled individuals "shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."); 42 U.S.C. § 12182(a) ("No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation....").

■ Both the Rehabilitation Act and the ADA state that discrimination against disabled individuals is prohibited "on the basis of" or "by reason of" their disability. While the statutory language suggests that proof of disability discrimination requires intent, the statutes, corresponding regulations, and the Supreme Court have made clear that other methods of proving disability discrimination are available.

■ In particular, Title III of the ADA contains a specific provision imposing a duty to provide reasonable accommodations to disabled individuals. *See* 42 U.S.C. § 12182(b)(2)(A)(ii) ("discrimination includes ... a failure to make reasonable modifications in policies, practices, or procedures...."). While Title II and Section 504 of the Rehabilitation Act lack such specific reasonable accommodation language, their corresponding regulations employ language indicating that entities must provide reasonable accommodations to the disabled. *See* 28 C.F.R. § 35.130(b)(7)(i); 28 C.F.R. § 41.53. Moreover, the Supreme Court has recognized a duty to provide reasonable accommodations in Section 504 of the Rehabilitation Act. *See Alexander v. Choate,* 469 U.S. 287, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (noting that "to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made.")

■ Thus, we have recognized that disability discrimination under the Rehabilita-

tion Act and the ADA can be established in three different ways: "(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999).

A.H. seeks the creation of a para-ambulatory division, with qualifying time standards that are better suited for runners like him, at the Sectional and State championship meet, as well as the Road Race. That is a request that the IHSA make a reasonable accommodation, and that is where we concentrate our analysis.

## A. Proof of But-For Causation

■ We have consistently held that the statutory language in both the Rehabilitation Act and the ADA requires proof of causation. *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 752 (7th Cir. 2006). As noted above, both statutes prohibit discrimination against individuals "by reason of" the disability, or "on the basis of" the disability. This language requires A.H. to prove "that, 'but for' his disability, he would have been able to access the services or benefits desired." *Id.* at 754 (citing *Washington*, 181 F.3d at 849).

■ The parties dispute the "benefit desired" by A.H., which ultimately impacts how the but-for causation test is employed. A.H. argues that the district court erred in finding that the benefit A.H. desires is to qualify for State. Rather, according to A.H., all he actually seeks is a *meaningful opportunity* to qualify for State. Thus, A.H. argues that the district court incorrectly held that in order to survive summary judgment, he had to "adduce evidence sufficient to create a material dispute of fact as to whether but for

his disability, he would be among the elite 10% of non-disabled runners who qualify for the state finals." *A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 263 F.Supp.3d 705, 722 (N.D. Ill. 2017).

We applied the but-for causation test in an analogous disability discrimination context in *Washington v. Indiana High School Athletic Association*, 181 F.3d at 848–49. In that case, a student-athlete with an undiagnosed learning disability dropped out of high school during his sophomore year following repeated failures, but re-enrolled at a different high school one year later where he played basketball. *Id.* at 842. The Indiana High School Athletic Association had an "eight semester rule," by which athletes could only compete in sport competitions spanning the eight semesters after they started their freshman year. *Id.* As a result of dropping out for over a year, the eight semester rule prohibited the student-athlete from playing at his new high school during his junior year. *Id.* In evaluating the causation analysis in *Washington*, we stated that the student-athlete "must establish that, but for his learning disability, he would have been eligible to play sports in his junior year." *Id.* at 849. In finding causation, we concluded that but-for his learning disability, he would not have dropped out of school, and thus, the normal operation of the eight semester rule would have made him eligible to play basketball. *Id.*

We disagree with A.H. The benefit he desires is to qualify for State. A.H. already has an opportunity to participate and run in the Sectional meet, but his disability impacts his ability to achieve the qualifying times necessary to qualify. A.H. wants the IHSA to establish different qualifying times for para-ambulatory runners that will allow him *to qualify for State*. Thus, in order to establish causation, A.H. has to prove that but-for his physical disability,

the normal operation of the qualifying times would have allowed him to qualify for State.

A.H. cannot meet this standard. Unlike the eight semester rule in *Washington*, which excluded the student-athlete based on the passage of time, the IHSA qualifying time standards are designed to make the individual races extremely competitive, purposely excluding a great-majority of runners from reaching State. The demanding qualifying times established by the IHSA exclude able-bodied and disabled runners alike, leaving 90% of all runners, many thousands, in fact, from participating at State every year. Simply put, the qualifying times ensure that the State championship meet is reserved for the best and fastest runners in Illinois. There is no reason to believe that disabled runners like A.H. have been unable to attain these qualifying times for State simply "by reason of" or "on the basis of" their disability. The odds are overwhelming that runners like A.H. would not meet the qualifying times even if they were not disabled.

A.H. points to the fact that not even the world record holders in his T-36 classification can meet the IHSA's qualifying times. However, the causation analysis depends on whether he would qualify for State if he were *not disabled*. The fact that A.H. does not have a chance to qualify as a disabled runner does not establish that the qualifying standards set by the IHSA are the but-for cause of his failure to qualify for State.

While A.H. is a gifted runner given his disability, A.H. has not established that, were he not disabled, he would be among the 10% of track and field athletes that qualify for State each year.

## B. Reasonable Accommodation

 Even if A.H. had adduced evidence that but-for his disability, he would

qualify for State or medal in the Road Race, his claim would fail because his requested accommodations are unreasonable as a matter of law. "Whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002). However, an accommodation is unreasonable if it imposes significant financial or administrative costs, or it fundamentally alters the nature of the program or service. *Id.*; *see also* 28 C.F.R. § 35.130(b)(7)(i) ("A public entity shall make reasonable modifications ... unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.").

A.H. stresses that adopting his accommodations would not impose such financial or administrative burdens. He points to the fact that the IHSA already has separate divisions in track and field for female runners, wheelchair athletes, and runners from smaller schools. However, the IHSA has never claimed that creating a para-ambulatory division would be burdensome in this way. Instead, the IHSA argues that implementing A.H.'s proposed accommodations would fundamentally alter the nature of the State championship track competition and Road Race because they would guarantee A.H. increased participation and success. In other words, A.H.'s lower qualifying time standards would undermine the competitiveness of the State championship meet and the Road Race. A.H. counters that he is not seeking lower time standards for all runners, but rather the creation of a para-ambulatory division.

The fact that A.H.'s proposed accommodations would not affect the qualifying times of able-bodied runners is of no consequence. The creation of a new division

would lower the current qualifying times and make it easier for certain runners to qualify for State or medal in the Road Race.

The Supreme Court and this Court have recognized that lowering particular eligibility or qualifying requirements established by an entity can be substantial modifications that are unreasonable. In *Southeastern Community College v. Davis*, the Supreme Court found that a deaf nurse's request to only participate in academic courses, and bypass clinical courses that she would be unable to perform safely, would constitute a fundamental alteration of a nursing program. 442 U.S. 397, 407–10, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); *see also Knapp v. Northwestern Univ.*, 101 F.3d 473, 482 (7th Cir. 1996) ("Legitimate physical qualifications may in fact be essential to participation in particular programs."). The Court in *Davis* held that Section 504 of the Rehabilitation Act does not require a school "to lower or to effect substantial modifications of standards to accommodate a handicapped person." *Id.* at 413, 99 S.Ct. 2361. In light of *Davis*, this Court found in *Brookhart v. Illinois State Board of Education*, that altering the content of a "Minimum Competency Test" in order to make it easier for mentally disabled students to pass would constitute a "substantial modification" of the Board's requirements in order to receive a diploma. 697 F.2d 179, 183–84 (7th Cir. 1983).

The Supreme Court's decision in *PGA Tour v. Martin* is illustrative of a fundamental alteration of a sporting event. 532 U.S. 661, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001). In that case, the Court noted that a fundamental alteration occurs either through a significant change that affects all athletes alike, but alters an essential aspect of the game; or, through a peripheral change that gives a disabled athlete an advantage over others. *Id.* at 682–83, 121

S.Ct. 1879. The Court found that allowing a disabled golfer to use a golf cart between his shots, instead of adhering to the walking-rule, would not fundamentally alter the nature of the game since "the essence of the game has been shotmaking." *Id.* at 683–85, 121 S.Ct. 1879. Instead, the accommodation would allow the golfer "the chance to qualify for, and compete in, the athletic events [offered] to those members of the public who have the skill and desire to enter." *Id.* at 690, 121 S.Ct. 1879.

That is not the case here. The essential nature of a track and field race is to run a designated distance in the shortest time possible. The IHSA's time standards, which govern which runners can qualify for the State championship, underscore the essence of the sport: one must run as fast as possible to achieve the predetermined times. According to the IHSA, the qualifying time standards ensure a certain level of competition and maintain a necessary scarcity of opportunity. To lower the qualifying times for State by creating a new division of runners would fundamentally alter the essential nature of the Sectional and State track and field meets, as well as the Road Race.

Moreover, as the Court noted in *Martin*, the golfer there had the skills to compete in golf's most elite tournaments. *See id.* at 667–68, 121 S.Ct. 1879 (noting that the golfer qualified for the PGA Tour in 1999, finished in the top 10 in six events, and finished second twice and third once). The Court approved an accommodation request that did not confer a competitive advantage on the golfer. *Id.* at 690, 121 S.Ct. 1879. A.H. concedes that his disability affects his running skills and his ability to compete with able-bodied runners at the Sectional meet. In his accommodation request to the IHSA, A.H. proposed adopting the LHSAA qualifying times for the para-ambulatory division, all of which A.H.

has easily accomplished and would assure that A.H. qualifies for State. A.H. clearly seeks an accommodation that would make him competitive and allow him to achieve results he currently cannot achieve.

The Rehabilitation Act and the ADA do not require the IHSA to alter the fundamental nature of their track and field events. Therefore, A.H.'s accommodation requests are unreasonable as a matter of law.

A.H. currently has the opportunity to compete in the Sectionals meet in order to qualify for State, as well as an opportunity to compete for a medal in the Road Race. The IHSA guarantees A.H. this equality of opportunity, and by all accounts, A.H., his teammates, and coaches have benefitted tremendously from his participation on the track and field team. However, the IHSA is not required under federal law to guarantee A.H. the results he desires from those opportunities.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of the IHSA.

Rovner, Circuit Judge, dissenting.

By any estimation, A.H. is a dedicated and accomplished athlete. He has participated in the U.S. Paralympic trials, has competed in state finals in swimming, has never missed a track meet, and has never finished a cross-country race in last place despite the fact that he is disabled but competing against able-bodied runners. A.H. has cerebral palsy, however, and therefore his body limits his ability to reach the highest levels of athletic performance no matter his level of skill, determination, or resources. A.H. will never have the times needed to qualify for the Illinois state final track competitions. No one with his disability will. But given his

elite status as a para-ambulatory athlete, he might well be (and likely is) in the top 10% of para-ambulatory runners and thus could qualify for state finals were there such a division. He has requested that the Illinois High School Association (IHSA) create one, but it has declined to do so. Many other states have divisions for para-ambulatory runners and the International Paralympic Committee has already created a system of classification for various impairments, so the IHSA would not need to create qualification standards from scratch and it concedes that there is no financial impediment to creating a new division. The majority has decided that the question as to whether or not the IHSA must provide him with such a reasonable accommodation will not go before a trier of fact; that is, that it is unreasonable as a matter of law.

The outcome of this case depends on who has correctly framed the issue. According to A.H., he was required to adduce evidence sufficient to create a material dispute of fact as to whether but for his disability, *he would have a meaningful opportunity* to qualify for the state finals. According to the IHSA, A.H. was required to adduce evidence sufficient to create a material dispute of fact as to whether but for his disability, *he would be among the elite 10% of runners who qualify* for the state finals.

The majority agrees with IHSA's framing and concludes that the benefit that A.H. desires is not merely to have a meaningful opportunity to qualify for state finals, but to actually qualify for those finals. This cannot be so. To understand why, it might be helpful to suppose that this case had occurred prior to the enactment of Title IX in 1972, and rather than being disabled, the plaintiff was a female athlete who could not participate in the heretofore (in this hypothetical) all-male state finals. If such a female athlete filed a

lawsuit seeking to have a separate category for female runners with different qualifying times, she would not have been asking to be guaranteed a spot in the state finals, but rather she would be asking to have the same opportunity to participate as her male peers. Perhaps the female runner is in the top percentile of all female runners, and yet her best times are still shy of the qualifying times for men. Although it is true that new qualifying times for female runners might mean that she is very likely to qualify for the state finals, that does not mean that her lawsuit automatically becomes one in which she is asking to qualify for state finals. She should not be punished merely because her hard work and good fortune have placed her in the top percentage of female runners—the very group likely to make it to state finals. In fact, any female would have standing to file a lawsuit asking for a female division such that she might have the opportunity to participate in a statewide competition.

A.H. has filed this lawsuit not because he wants to be guaranteed a spot at the state finals, but because he desires the same opportunity to qualify for finals as any other runner. It is true that the state final competition is an elite event in which only approximately ten percent of non-disabled runners qualify, but a non-disabled runner who has the magic mix of drive, determination, ability to train, good coaching, resources, genetic make-up, and luck has the opportunity, albeit small, to make it to the state finals. A.H.'s chance of advancing to finals is zero. No matter how much drive, determination, good coaching, ability to train, resources, and luck he has, he can never compete in a state finals race—a fact that is the result of his physical disability.

The female runner in my example does not need to demonstrate that but for the fact that she was born female, she would

have a chance to make the qualifying time for the state finals. It is the opportunity to try that she is missing. Likewise, A.H. does not have to demonstrate that but for his disability he would meet the qualifying standards for the state finals. The current program denies him a meaningful opportunity to try. How could any athlete ever demonstrate that but for his disability he would qualify for state finals? Had A.H. been born in an entirely different body, one that did not have cerebral palsy, would he be in the top 10% of runners? How can we know what his body would have been like but for his disability. Would it have been more muscular? Would his heart have been stronger? Would he be taller, with longer legs? This is an absurd pursuit. And, in fact, if this were the correct standard, the question as to whether he would have qualified for the state finals but for his disability would be a factual one for the jury, and one that might likely be answered in the affirmative. After all, despite A.H.'s disability, he manages to outperform even some able-bodied runners. And given his drive, determination, and dedication, it seems likely that he is just the kind of athlete that would make it to the state finals. But trying to imagine a world in which A.H. is not disabled, is not a fruitful exercise, nor is it something a court can determine as a matter of law.

In any case, there is no guarantee that any runner will make it to finals. Even the most elite runners can have a bad day. Sometimes runners trip and fall, sometimes they fall ill with viruses, sometimes an unknown up-and-coming youngster emerges out of the pack and surpasses them. What is fruitful and can be determined, however, is whether disabled runners have the same opportunities as any other athlete to try their hardest to make it to the state final competition.

The majority also concludes that even if A.H. adduced evidence that but for his disability he would qualify for state finals, his claim would fail because his requested accommodations are unreasonable as a matter of law. According to the majority, the creation of a new division would fundamentally alter the nature of the program or service by undermining the competitive nature of the state championship and road race. The majority states that "[t]he essential nature of a track and field race is to run a designated distance in the shortest time possible." Ante at 595. "To lower the qualifying time standards for State by creating a new division of runners," the majority reasons, "would fundamentally alter the essential nature of the Sectional and State track and field meets, as well as the Road Race." Id. But this is exactly what the IHSA did when it created separate divisions for female runners, wheelchair athletes, and runners from smaller schools. It lowered the qualifying standards for the state finals by creating a new division with different required qualifications. And if doing so altered the essential nature of the state finals and road race, then either those divisions should never have been created or the fundamental nature of the program has already been modified. But the reality is that running a designated course and distance in the shortest period of time is not the essential nature of a track or road race. It is running that race in the shortest period of time *as compared to one's peer group*. No one would think it fair if Usain Bolt signed up to compete in the IHSA state finals despite the fact that he could surely run the designated course in the shortest period of time.

According to the majority's reasoning, lowering qualifying standards "would undermine the competitiveness of the State championship meet and Road Race." Ante at 594. I wholeheartedly reject the notion that allowing separate divisions for women and disabled persons somehow "undermines the competitiveness" of a sporting event or denigrates the accomplishments of elite male athletes. This is akin to saying that allowing women to run in Olympic track events, where the qualifying times are lower, "undermines the competitiveness" of the men's Olympic track events. As A.H. argued, "under IHSA's theory, allowing Serena Williams to play tennis at Wimbledon or Katie Ladecky to swim at the Olympics would somehow 'strip' those competitions of their identity and prestige, devaluing the achievements of Roger Federer and Michael Phelps." Appellant's brief at 32.

The separate divisions for smaller schools is particularly good evidence that creating new categories does not fundamentally alter the nature of the program or undermine the competitiveness of the championship. Wheelchair athletes and women, on average, take longer to complete the same races because of immutable physical characteristics. Smaller schools must pick runners from a smaller pool, but attendance at any particular school is merely the happenstance of geography. There is no physical or genetic reason that a runner from a small school would not be able to run just as fast as a runner from a larger school. Instead, IHSA has created separate divisions for smaller schools for reasons other than just allowing the fastest runners in the state to compete—most likely to allow greater access to the finals for runners who might not otherwise have a meaningful chance to compete there. Moreover, in other ways as well, the IHSA has established a system that ensures not only that "the best and fastest" runners go to finals, but that the opportunity is open more expansively. For example, each school may send only its top two runners to compete in each event at the sectional tournaments—the tournament through

which runners qualify for the state finals. A school with the top five runners in the state will have to leave three of those "best and fastest" runners behind so that other schools have the opportunity to send some students as well. If the essence of the competition was to have only the "best and fastest runners in Illinois" as the majority contends (ante at 594), then the IHSA would open the finals only to the top 10% of runners in the state regardless of gender, ability, school size or sectional results.

The cases the majority cites only reinforce the well-established legal concept that a person seeking a reasonable accommodation must be otherwise qualified, with or without accommodation, for the job, program, or service. See *Khan v. Midwestern Univ.*, 879 F.3d 838, 841–42 (7th Cir. 2018) (noting that a pregnant medical student was not entitled to a reasonable accommodation if she was not otherwise qualified academically for the program). A deaf nurse who cannot safely administer patient care is not otherwise qualified, even with an accommodation, for the job. *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). Nor are students who cannot meet minimum academic requirements in a particular program, with or without a reasonable accommodation. *Khan*, 879 F.3d at ——; *Brookhart v. Ill. State Bd. of Educ.*, 697 F.2d 179, 184 (7th Cir. 1983). Professional golfer Casey Martin, however, was otherwise qualified to play in a professional golf tournament provided his disability could be accommodated by using a golf cart to traverse the course. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 690, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001). A.H. is otherwise qualified to run in a track event and the reasonable accommodation he requests will not change the nature of any other event or the competition as a whole.

Like any female athlete, wheelchair athlete, or athlete from a smaller school, A.H. would like the meaningful opportunity to compete against his peer group for a chance to qualify for the state finals. The success of any para-ambulatory athlete would in no way diminish the success of any other athlete or alter the fundamental nature of the competition. The majority offers no explanation for why it might. A.H. has more than earned this opportunity. I respectfully dissent.