In the

# United States Court of Appeals

### For the Seventh Circuit

No. 20-2946

ROBERT MCDANIEL, as Executor of
the Estate of Carl Joseph McDaniel,

*Plaintiff-Appellant,*

*v.*

SALAM SYED, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:17-cv-01493-WCG — **William C. Griesbach**, *Judge.*

ARGUED JANUARY 13, 2022 — DECIDED SEPTEMBER 16, 2024

Before HAMILTON, BRENNAN, and JACKSON-AKIWUMI,
*Circuit Judges.*

HAMILTON, *Circuit Judge.* Carl McDaniel was a Wisconsin
prisoner for more than fourteen years. He had many serious
medical conditions, including some that caused problems
with mobility and incontinence. McDaniel sued the Wiscon-
sin Department of Corrections under Title II of the Americans
with Disabilities Act (ADA), 42 U.S.C. § 12131, and Section 504

of the Rehabilitation Act, 29 U.S.C. § 794. He asserted that the Department violated his rights under both statutes by denying him a cell (a) in a no-stairs unit, (b) that was single-occupancy, and (c) with a bed without a top bunk above it. McDaniel also brought an Eighth Amendment claim against a prison physician, Dr. Salam Syed, alleging he was deliberately indifferent to McDaniel's medical needs. The district court granted summary judgment for the Department on all claims and for Dr. Syed on the Eighth Amendment claim. McDaniel appealed.[1]

After we heard oral argument, McDaniel was released from prison, but he later died, in February 2024. His son Robert McDaniel represents his father's estate and is now the plaintiff.

We affirm in part and reverse in part. We affirm summary judgment for defendants on the claims for a single-occupancy cell and no top bunk, as well as on the Eighth Amendment claim against Dr. Syed. We reverse on the refusal to assign McDaniel to a no-stairs unit. McDaniel presented evidence that having to make his way up and down stairs to get to meals, the infirmary, and other prison programs effectively denied him access to those programs, and that the Department knew its refusal to place McDaniel in a no-stairs unit was having that effect. In particular, McDaniel presented evidence that denial of a no-stairs unit caused him to miss about 600 meals in just the one year he was in the Columbia

---

[1] After plaintiff McDaniel appealed the grant of summary judgment, we recruited counsel for him. Attorneys Thomas G. Hungar and Andrew G.I. Kilberg and the firm of Gibson, Dunn & Crutcher LLP have ably represented plaintiff McDaniel before the panel. They have the thanks of the court.

Correctional Institution, and that prison staff knew he was missing meals and medication because of his pain and difficulty in getting up and down stairs. He presented this evidence with sufficient clarity to the district court so that the district court and we are required to treat those facts as true. On these facts, which we hope are unusual, a reasonable jury could find that the denial of a no-stairs unit amounted to an intentional violation of rights under the ADA and the Rehabilitation Act.

McDaniel's release from prison rendered moot his request for injunctive relief, but his ADA and Rehabilitation Act claims for compensatory damages survive his release from prison and his death and are still available. A jury could find prison officials were deliberately indifferent to McDaniel's lack of access to various prison programs. Because a jury could also find this same conduct—deliberate indifference to McDaniel's inability to access, in particular, regular meals—violated the Eighth Amendment, the Department is not entitled to sovereign immunity, and compensatory damages may be available under the ADA for failure to accommodate his disabilities.

I.  *Procedural Issue*

Before turning to the merits, we first address a key procedural issue in the district court's handling of the facts on summary judgment. The district court declined to treat as true McDaniel's evidence that the defendants' refusal to assign him to a no-stairs cell caused him to miss roughly 600 meals in one year and that defendants were aware of this consequence. The district court's refusal was an error.

McDaniel litigated in the district court pro se, including the summary judgment motions. (There was a brief exception; court-recruited counsel drafted his amended complaints and then withdrew.) As part of the summary judgment proceedings, the defendants filed their proposed findings of fact subject to Civil Local Rule 56 of the Eastern District of Wisconsin. In the absence of an agreed statement of undisputed facts, the rule requires the moving party to file a statement of proposed material facts. See E.D. Wis. Civ. Local Rule 56(b)(1). These statements must contain numbered paragraphs and specific citations to support the factual assertions. Local Rule 56(b)(1)(c)(i). The opposing party is then required to respond to the moving party's statement of material facts by identifying which facts, if any, are in dispute, and citing record evidence to support the party's assertions. Local Rule 56(b)(2). The rule says the record citations must be "specific" but does not specify a particular form for those record citations.

Consistent with our decision in *Lewis v. Faulkner*, 689 F.2d 100, 102 (7th Cir. 1982), the district court promptly issued a notice to McDaniel advising him as follows:

> Plaintiff Carl Joseph McDaniel, who is representing himself, filed a complaint under 42 U.S.C. § 1983. On June 29, 2020, the defendants filed a motion for summary judgment. (ECF No. 159.) Under Civil L. R. 56(b)(2), McDaniel's response materials are due within thirty days of service of the motion, or by Wednesday, July 29, 2020. In responding to the defendants' motion for summary judgment, McDaniel must respond to each of the defendants' proposed findings of fact by agreeing with each proposed fact

or explaining why he disagrees with a particular proposed fact. If he does not indicate one way or the other, the court will assume that he agrees with the proposed fact. McDaniel must support every disagreement with a proposed fact by citing to evidence. He can do that by relying on documents that he attaches to his response or by telling the court his version of what happened in an affidavit or an unsworn declaration under 28 U.S.C. § 1746.[1] An unsworn declaration is a way for a party to tell his side of the story while declaring to the court that everything in the declaration is true and correct. McDaniel must also respond to the legal arguments in the defendants' brief.

_____

[1] At the bottom of his declaration he should state: "I declare under penalty of perjury that the foregoing is true and correct. Executed on [date]. [Signature]." 28 U.S.C. § 1746(2).

Dkt. No. 169.

McDaniel took the court's notice to heart. On August 14, 2020, he filed seven documents (docket entries 176–82), including a response to the defendants' proposed findings of fact, a brief, a separate "reply to defense argument," and responses to four affidavits submitted by the defendants. The documents totaled 33 pages.

Plaintiffs' documents responded paragraph by paragraph to the defendants' proposed statements of fact, and even paragraph by paragraph to each affidavit the defendants

submitted and paragraph by paragraph to the defendants' brief. He also submitted his own statements of undisputed and disputed facts.

In most of his response paragraphs, however, McDaniel did not provide specific docket number citations to the record. Still, he did in places refer by name to various documents in the record when directly responding to paragraphs in the defendants' summary judgment briefing that included such record citations. For example, he referred to "the 'Initial' Dr. Paul Order" for the proposition that his surgeon recommended he not lift more than five to ten pounds. This was in his numbered response to paragraph 11 of defendants' proposed statement of facts, which included a record citation to the same doctor's report that McDaniel cited by name.

Most important, though, and consistent with the district court's directions, McDaniel signed all of those documents under penalty of perjury under 28 U.S.C. § 1746. That meant that all of those documents had the legal effect of affidavits. They provided evidence that could be considered on summary judgment to the extent that McDaniel's factual assertions were within his personal knowledge and were otherwise admissible. See *Owens v. Hinsley*, 635 F.3d 950, 955 (7th Cir. 2011) ("[A] declaration under § 1746 is equivalent to an affidavit for purposes of summary judgment."); *Ford v. Wilson*, 90 F.3d 245, 246–47 (7th Cir. 1996) (complaint verified under penalty of perjury amounted to affidavit that could be relied upon to oppose summary judgment).

In its summary judgment ruling, however, the district court wrote that "not all of his responses or his own proposed findings of fact cite to an affidavit, declaration, or specific part of the record to support them." SA 4. The court added that it

would consider plaintiff's proposed facts and responses to defendants' proposed facts only "to the extent they comply with the local rules," without specifying further the failures or the affected portions of plaintiff's submissions. *Id.* The court relied primarily on the defendants' version of the facts in deciding the summary judgment motions.[2]

McDaniel contends this decision was an abuse of discretion. An appellate court reviews the decision of a district court to enforce its local rules for an abuse of discretion. *Hinterberger v. City of Indianapolis*, 966 F.3d 523, 528 (7th Cir. 2020). District courts "may require strict compliance with their local rules," *id.*, and we have held that enforcing such rules in the event of non-compliance is generally not an abuse of discretion. See *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809–10 (7th Cir. 2005) ("A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed."); see also *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) ("Substantial compliance is not strict compliance."). A district court is not authorized, however, to reject a party's summary judgment submissions for failure to comply with unwritten requirements.

---

[2] McDaniel did not, as Local Rule 56.1(b)(2)(B)(i) requires, reproduce each numbered paragraph in the defendants' statement of facts. That requirement would be onerous as applied to a prisoner who has only limited access to a defective typewriter, and the district court does not appear to have relied on that failing. See also Fed. R. Civ. P. 83 (a)(2) ("A local rule imposing a requirement of form must not be enforced in a way that causes a party to lose any right because of a nonwillful failure to comply.").

This is one of the rare cases in which the district court went a step too far, at least with respect to one key fact. In his response to the defendants' proposed findings of fact, McDaniel testified that he was "missing [h]undreds of state meals" at the Columbia Correctional Institution. In his response to defendant Dr. Syed's affidavit, McDaniel said the prison "denied [me] over 600 state meals." His brief echoed these points, saying that he "missed over 600 state meals in less than a year because of severe pain," and "Defendants were all aware of the ongoing constitutional violations of the [o]ver 600 … state meals." Defendants' own summary judgment submissions also show that they were aware of plaintiff's complaints that he was missing many meals and medications because of pain and difficulty getting up and down stairs. See Def. Proposed Findings of Fact ¶¶ 30 36, 38, 39, Dkt. No. 167.

Local Rule 56.1 did not require plaintiff to cite other affidavits *in his affidavits*. This seems to be the principal point of our disagreement with the district court and with our dissenting colleague. Where the moving party asserts as an undisputed fact "X is the case," and plaintiff responds in the corresponding paragraph "X is not the case," and where the plaintiff's response is attested under § 1746 and within his personal knowledge, that is enough to dispute whether X is true or false. See *Owens*, 635 F.3d at 955; *Ford*, 90 F.3d at 246–47 (7th Cir. 1996). Moreover, defendants' summary judgment papers did not even try to contradict directly plaintiff's complaints about missing meals and medications because of his pain and difficulty with stairs. We are required to treat as true

plaintiff's factual assertions that were supported with evidence, including his own affidavits.[3]

It is evident that McDaniel, a pro se litigant, tried to comply with the district court's instructions. See *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("[A] trial court is obligated to give a liberal construction to a pro se plaintiff's filings."). We know well that rules like Local Rule 56 are intended "to make the summary judgment process less burdensome on district courts, by requiring the parties to nail down the relevant facts and the way they propose to support them." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012) (evaluating parallel local rule from another district). That process can help a busy district court determine which facts are supported by the record and which are not. It also gives the court and the opposing party notice of which legal and factual issues are up for debate. At the same time, we have also explained that local rules—and instructions on how to comply with them—are "not intended to provide a maze of technical traps to complicate and delay litigation without advancing the merits." *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011) (district court did not abuse discretion by overlooking moving parties' technical failures to comply with local rule on summary judgment materials). Unfortunately,

---

[3] McDaniel was not consistent about how many hundreds of meals he missed. In the amended complaint, he said the number was approximately 500. In his testimony submitted on summary judgment, that number was over 600. In one place in his brief in opposition to summary judgment, he said an individual employee knew he missed over 450 meals, again citing by name exhibits attached to that official's declaration in the record. The difference between 450 and 600 meals was not the basis for the district court's rejection of evidence that McDaniel missed hundreds of meals.

that is what occurred here, primarily because the district court may not have appreciated that plaintiff could rely on his own factual assertions in his own declarations without citing any other documents.

One could criticize plaintiff for not having organized his summary judgment submissions as coherently and persuasively as an experienced lawyer might have. That does not justify overlooking, however, plaintiff's specific factual assertions made under penalty of perjury. Even for excellent lawyers, it can be difficult to provide a clearly organized response to a motion for summary judgment. Local rules like this one allow the moving party to organize the facts and the narrative. The non-moving party is required to follow that organization, at least with respect to proposed facts. That can make it difficult for a non-moving party with a solid case to weave the evidence into a coherent narrative and to show how different facts and theories are related. For pro se parties, the challenge can be especially daunting. In this case, however, we conclude that McDaniel's 33 pages of summary judgment submissions told the district court with sufficient clarity that he was relying on his own testimony about missing hundreds of meals and medications, and about defendants' awareness of that consequence of his pain and mobility limits. And he made that point in the portion of his brief addressing his ADA and Rehabilitation Act claims. See Dkt. No. 177 at 10.

To be sure, McDaniel's submissions were not "by any measure ideal." *Sojka*, 686 F.3d at 398. Many of his supposed facts were conclusory and argumentative. That is also often true of submissions by counsel, of course, and a district court is entitled to disregard such conclusory assertions even if a party tries to ground them in record citations. *Cichon*, 401 F.3d

at 808, 809–10 (no abuse of discretion in disregarding conclusory submissions that lacked factual support). But the fact that some proposed facts are conclusory or argumentative does not mean a court is free to disregard the ones that are factual and specific. See Fed. R. Civ. P. 56(e) advisory committee's note to 2010 amendment ("If there is a proper response or reply as to some facts, the court cannot grant summary judgment without determining whether those facts can be genuinely disputed.").

We conclude the district court abused its discretion in disregarding McDaniel's factual assertion sworn under penalty of perjury that he had missed approximately 600 meals in one year at Columbia and that prison staff knew he was regularly missing meals due to his pain and difficulty in moving up and down stairs. McDaniel was entitled to have the court assume those facts in his favor in deciding the defendants' motions for summary judgment.

In the following portions of this opinion, we first summarize the material facts, filtering the evidence through the lens of summary judgment procedure. Next, we turn to McDaniel's ADA and Rehabilitation Act claims. We explain why disputes of material fact remain related to the failure of the Department of Corrections to accommodate McDaniel by refusing him a no-stairs unit and why Eleventh Amendment sovereign immunity does not bar his request for money damages for this claim. We then explain why summary judgment for defendants was proper on McDaniel's two other failure-to-accommodate claims. Finally, we explain why we affirm summary judgment for Dr. Syed on McDaniel's separate Eighth Amendment claim for deliberate indifference.

II.  *Factual and Procedural History*

We set forth the facts in the light most favorable to McDaniel and give him the benefit of all reasonable inferences in his favor, as required on summary judgment. E.g., *Navratil v. City of Racine*, 101 F.4th 511, 516 (7th Cir. 2024). For more than fourteen years, Carl McDaniel was a prisoner in the custody of the Wisconsin Department of Corrections. When he filed this appeal, McDaniel was in his early sixties and had extensive medical problems, including hypertension, hyperthyroidism, chronic obstructive pulmonary disease, stage 3 chronic kidney disease, bladder tumors, type 2 diabetes complicated by neuropathy, gout, fibromyalgia, anxiety, post-traumatic stress disorder, bipolar disorder, chronic pain, peptic ulcer disease, asthma, and degenerative joint disease in his spine with spinal stenosis. McDaniel had developed some of these ailments before his incarceration and others during.

While incarcerated, McDaniel received medical treatment for those ailments, including spinal surgery in the summer of 2017. Before that surgery, McDaniel used a wheelchair. Afterward, he could move using a four-wheel walker. But McDaniel continued to experience other medical problems, including degenerative joint disease of the spine and incontinence issues, resulting in significant back pain and difficulty controlling urination and defecation. Following his spinal surgery, the treating physician gave McDaniel several post-operative instructions: he was to avoid "strenuous exercising," "lift[ing] more than 5–10 pounds," and "bending, lifting, carrying, twisting," but the physician said he could "climb stairs."

A. *Problems at the Columbia Correctional Institution*

A few months after the spinal surgery, the Department of Corrections transferred McDaniel to the Columbia Correctional Institution. Before the transfer, McDaniel had restrictions in his file for a low-tier floor, no-stairs unit, low bunk, and walker. At the new facility, however, a physical therapist evaluated McDaniel and recommended changing those restrictions. As part of the evaluation, McDaniel had successfully walked up and down just *six* stairs. The therapist concluded the no-stairs and low-tier restrictions were no longer necessary. McDaniel's eventual cell assignment, he said, required him to walk up and down the stairs at least sixteen times each day to access prison programs and activities, including meals and the infirmary. Defendant Dr. Syed, one of the facility's treating physicians, approved discontinuing those restrictions. McDaniel then received a walker, a cane, and a double-occupancy cell with a low bunk, but in a unit that was accessible only by stairs.[4]

The cell assignment created problems for McDaniel almost immediately. For one, the stairs impeded his access to meals and medications since the cafeteria and infirmary were on another floor. McDaniel complained from the start that he was not able to get out of his cell to eat or to retrieve his pain medication. He eventually stopped attending most meals and taking his medications because of the pain from going up and down the stairs to access those services. In the end, McDaniel

---

[4] At some point during McDaniel's time at Columbia, he was moved to a different double-occupancy cell. There were no relevant differences between these two cells. Both required using stairs to attend meals and retrieve medications.

testified, he missed some 600 meals during his year at Columbia.

When McDaniel was able to navigate the stairs, he did so with help. For instance, McDaniel would often purchase food from the prison commissary. To pick up his orders, McDaniel would use the goods he brought from the commissary to "pay" other prisoners to help him up and down the stairs. Other prisoners carried McDaniel's walker for him while he used the railing to move or sat and scooted down the stairs. Sometimes other prisoners would even put their arms around him and walk McDaniel up the stairs. But prison staff eventually forbade McDaniel from asking prisoners, guards, or anyone else for help. Staff also told McDaniel he had to stop scooting down the stairs on his buttocks or he would get a "conduct report."[5]

McDaniel also had difficulty navigating his cell. In double-occupancy cells that contain a toilet, people sometimes use so-called "courtesy screens" to create some privacy. Most of the time, McDaniel could use his walker to access the toilet. When a courtesy screen was up, however, there was simply not enough room to hold onto the walker when using the toilet.

---

[5] In McDaniel's version of events, the walker did little to solve the stairs problem: "It's made out of steel and it's got a chair on it…. I couldn't hold it with one hand…. But I couldn't hold that and hold the rail and get up and down the stairs…." McDaniel asserted under penalty of perjury that his walker weighed about twenty-five pounds, well over the five-to-ten-pound lifting restriction he was prescribed after his surgery. McDaniel likewise contends that the cane did not help. To use the cane, McDaniel also had to carry his walker since the walker was necessary to move once he made his way up or down the stairs. Carrying both a walker and a cane, he said, was too much for him to handle.

As a result, McDaniel emphasizes, he had multiple falls moving around his cell and when using the toilet, which lacked railings and support to hold.

Toilet access was especially important for McDaniel. Since he had difficulty controlling his bladder and bowels, at least one doctor told McDaniel to practice timed voiding (going to the bathroom in fixed time intervals, rather than by demand). Without his own toilet and the ability to practice timed voiding, he would often soil himself. His cellmates, McDaniel says, had difficulty with his timed voiding and accidents. He contends that animosity contributed to a difficult living environment that caused him significant stress and led to an altercation with one cellmate.

In addition, McDaniel's bed also had a top bunk where a cellmate slept. Due to what McDaniel described as a "lack of flexibility in my entire spine," he often hit his head and neck on that bunk, contributing further to his pain. His cellmate would also often hit McDaniel when climbing into the top bunk.

B. *Requests for Accommodations*

McDaniel submitted several requests for accommodations of his disabilities at Columbia. All were denied. A few days after receiving his cell assignment, McDaniel asked for a "feed in cell" restriction. His request was denied after a staff member saw McDaniel walking around the unit. McDaniel later sent two accommodation requests to the facility's ADA coordinator because of his "Fibromyalgia, Diabetes, (painful) Neuropathy, [arthritis] of my Spinal Cord/Knees, need for Mobility Impairment Device (walker)." The requests documented his falls trying to "access[] [the] unsafe toilet;"

instances where he struck his "Head/Neck on bunk;" and a general "inability to access meds, food, services, programs, and benefits from exacerbated pain [from] transitioning [the] stairwell." McDaniel also submitted a "Health Service Request" for a "handicap accessible cell." The ADA Coordinator responded to these submissions by explaining that McDaniel's low-tier and no-stairs restrictions had been removed, so he did not qualify for a "handicap cell." No other actions were taken.

At an appointment with the facility's Health Services Unit—where Dr. Syed worked—McDaniel again asked for a single-occupancy, wheelchair-accessible cell. He explained that he "has pains and has no medication," and "cannot go up or down stairs." Health Services staff told him that he did not meet the criteria for a single-occupancy or wheelchair-accessible cell and that "many/most ppl live w/ pain and he will endure if he wants to do the activity."

McDaniel had more appointments with the Health Services Unit. His complaints continued. McDaniel told the staff about his chronic pain, lack of access to meals, and incontinence issues. Despite these consistent complaints, Dr. Syed and others did not modify McDaniel's restrictions and continued to refuse him a cell on a floor where he would not need to use stairs to access services, including meals. When McDaniel again told Health Services staff that he was not taking his medications because it was too painful to go up and down the stairs to retrieve them, staff members instructed him to "take your medication as prescribed." Others told him to try physical therapy. Staff members told McDaniel that movement would help him to avoid developing muscle atrophy. In the end, Health Services staff evaluated McDaniel at

least forty-nine times during his year in the Columbia Correctional Institution.

While prison staff members, including Dr. Syed, continued to deny McDaniel any new accommodations or significant changes in medical treatment, various doctors outside of the facility assessed McDaniel. Those doctors came to different conclusions about McDaniel's care.

To start, a nephrologist who treated McDaniel's kidney conditions visited him in his cell to conduct an exam. At that time, McDaniel did not have a cellmate. The nephrologist wrote that the "current singled cell is providing him this option [to do timed voiding] and I would recommend this to continue as to avoid further complications and stress associated with" incontinence. Shortly after the nephrologist's visit, however, the facility gave McDaniel a cellmate and continued to offer him diapers to help with his accidents. When the nephrologist followed up with McDaniel a few months later, she noted a significant decline in his condition. She wrote in his chart that the "single cell status was previously significantly helpful in minimizing issues and stress surrounding bowel and bladder concerns," and that timed voiding was critical for treating his chronic kidney disease. McDaniel continued to live in a double-occupancy cell with a cellmate.

Other doctors expressed similar opinions that contradicted Health Services staff. A pain specialist, for instance, assessed McDaniel and recommended that he be "put in [a] cell with no top bunk," which would help mitigate instances

where he would hit his head and neck. McDaniel's sleeping arrangements did not change.[6]

C. *Procedural History*

McDaniel filed this lawsuit against the Wisconsin Department of Corrections, Dr. Syed, and others seeking both injunctive and monetary relief. He alleged that the Department violated his rights under the ADA and the Rehabilitation Act by refusing to accommodate his disabilities. McDaniel also alleged that Dr. Syed and others violated the Eighth Amendment in various ways.[7]

---

[6] After McDaniel had been at Columbia for just over a year, the Department transferred him to the New Lisbon Correctional Institution. Here, the facility shuffled McDaniel between no-stairs cells, normal double-occupancy cells, and even a so-called "dry cell" (lacking a toilet). After McDaniel filed this lawsuit, the facility changed course. It gave him a single-occupancy cell with a toilet and a medical mattress. The staff lowered the bottom bunk and raised the top bunk so McDaniel would not hit his head getting in and out of bed. The facility also instituted a wheelchair restriction for long distances, a shower chair restriction, and gave McDaniel diapers to help with his incontinence issues. While the vast majority of McDaniel's arguments concern the accommodations he was denied at Columbia, he also contends that New Lisbon's accommodations were not reasonable. The evidence underlying those claims is lacking by comparison and underdeveloped. We agree with the district court that no reasonable jury could find for McDaniel on those claims, and we focus our discussion on Columbia.

[7] McDaniel initially brought claims against other prison officials at Columbia and New Lisbon but did not pursue those claims on appeal. He had also sought a preliminary injunction demanding accommodations of his disabilities. The district court denied the injunction after the Department assured the court it would keep McDaniel in a single-occupancy wet cell for the length of the case. After the district court granted summary judgment, the Department moved McDaniel to yet another facility where

McDaniel litigated in the district court pro se, with one exception. The district court appointed counsel for the limited purpose of helping McDaniel file an amended complaint. The appointed counsel then withdrew with court approval. Upon the close of discovery, the defendants moved for summary judgment. As discussed above, the district court granted the defendants' motion after largely discounting McDaniel's factual statements.

After we heard oral argument in this appeal, McDaniel was released from prison, which rendered moot his requests for injunctive relief. In February 2024, McDaniel died. We granted his son's motion to be substituted as the plaintiff in this case, acting as executor of McDaniel's estate. See Fed. R. App. P. 43(a)(1); *Smith v. First Hospital Laboratories, Inc.*, 77 F.4th 603, 607 (7th Cir. 2023) (proceeding with appeal after substituting executor of plaintiff's estate as plaintiff).[8]

III. *Eleventh Amendment Sovereign Immunity*

Sovereign immunity bears on whether a federal court may hear a case, so we address it before reaching the merits. See *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 64–65 (1996). The district court quite reasonably chose to avoid "thorny questions of sovereign immunity" under the ADA by

---

he claimed he faced challenges similar to those complained of here. See *McDaniel v. Wisconsin Dep't of Corrections*, No. 21-3048, 2022 WL 1965902 (7th Cir. June 6, 2022) (vacating denial of preliminary injunction).

[8] Wisconsin law provides for survival of a plaintiff's claims for personal injuries like McDaniel's. Wis. Stat. § 895.01(1)(am)(7) (causes of action for "other damage to the person" survive death of plaintiff); see, e.g., *Sawyer v. Midelfort*, 227 Wis. 2d 124, 151–54, 595 N.W.2d 423, 436–38 (1999) (claim for psychological damage caused by medical malpractice survived death of plaintiff).

analyzing McDaniel's reasonable accommodation claims under the Rehabilitation Act. See *McDaniel v. Syed*, No. 17-cv-01493, 2020 WL 5570401, at *7 (E.D. Wis. Sept. 17, 2020), citing *Jaros v. Illinois Dep't of Corrections*, 684 F.3d 667, 671–72 (7th Cir. 2012). Because of McDaniel's release from prison and later death, however, the only remedy available if McDaniel succeeds on his reasonable accommodation claim is money damages. This makes the issue of Eleventh Amendment state sovereign immunity more critical. Relief available under Title II of the ADA and the Rehabilitation Act is "coextensive," *Jaros*, 684 F.3d at 671, and Wisconsin has waived its immunity from suits for damages under the Rehabilitation Act as a condition of its receipt of federal funds. See *Stanley v. Litscher,* 213 F.3d 340, 344 (7th Cir. 2000). We do not think this ends our inquiry, though. We think it prudent to address whether sovereign immunity would bar McDaniel from seeking money damages under Title II of the ADA.

Congress may abrogate state sovereign immunity when exercising its enforcement power conferred by section 5 of the Fourteenth Amendment. *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Bd.*, 527 U.S. 666, 670 (1999). The ADA provides: "A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202. The Supreme Court has recognized this statement as an unequivocal expression of Congress's intent to abrogate state sovereign immunity. See *United States v. Georgia*, 546 U.S. 151, 154 (2006); *Board of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363–64 (2001); see also *Seminole Tribe*, 517 U.S. at 55 ("In order to determine whether Congress has abrogated the States' sovereign immunity, we ask two questions: first, whether

Congress has 'unequivocally expresse[d] its intent to abrogate the immunity,' and second, whether Congress has acted 'pursuant to a valid exercise of power.'" (alteration in original) (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985))).

Whether Congress validly exercised its section 5 enforcement power in the ADA is a separate question. The Supreme Court explored this question in *United States v. Georgia*, 546 U.S. 151 (2006), and explained that there are two paths by which Congress could have validly abrogated state sovereign immunity under Title II of the ADA.

First, a plaintiff can show that his claim falls into the category of valid prophylactic legislation Congress enacted under section 5 following the three-step inquiry articulated in *Tennessee v. Lane*: (1) identify the rights at issue, (2) identify the pattern of violations the legislation is designed to remedy and prevent, and (3) determine whether the legislation is congruent with and proportional to the pattern of violations. 541 U.S. 509, 522–34 (2004); see also *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997) (holding that Congress may enact prophylactic legislation to remedy or prevent unconstitutional discrimination under section 5 of the Fourteenth Amendment if the legislation exhibits "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end").

Alternatively, as in *Georgia*, Title II of the ADA validly abrogates state sovereign immunity for conduct that also represents a violation of the Fourteenth Amendment. A plaintiff taking this route need not satisfy the congruence and proportionality inquiry under *Lane* and *Boerne* because the plaintiff does not seek to hold a state liable for damages for conduct that is constitutional. In these cases, ADA Title II liability acts

not as "prophylactic" legislation but as a remedy for an actual
constitutional violation.

We explain below that the deprivation of food that
McDaniel argues violates Title II of the ADA would also vio-
late the Eighth Amendment's prohibition on cruel and unu-
sual punishment, as incorporated against the states through
the Fourteenth Amendment (or at least a reasonable jury
could find as much). Therefore, regardless of whether relief is
granted under the Rehabilitation Act or Title II of the ADA,
the Wisconsin Department of Corrections is not immune from
liability for money damages under the Eleventh Amend-
ment.[9] We return to this issue in more detail below, after ad-
dressing the merits of McDaniel's ADA and Rehabilitation
Act claims, including the availability of money damages.

IV. *ADA and Rehabilitation Act Claims*

We review de novo the district court's grant of summary
judgment, giving the non-moving party the benefit of

---

[9] McDaniel could recover damages under either the ADA or the Re-
habilitation Act but not both. He could have only one recovery for the
same injury. See *Duran v. Town of Cicero,* 653 F.3d 632, 639 (7th Cir. 2011)
(a plaintiff may have but one recovery); *Calero–Cerezo v. United States Dep't
of Justice,* 355 F.3d 6, 11 n. 1 (1st Cir. 2004) (dismissal of ADA claim had no
effect on scope of remedy because Rehabilitation Act claim remained). De-
spite this, some recent court decisions have still considered the issue of
sovereign immunity under both statutes before resolving plaintiffs' claims
on the merits, as we have done here. See, e.g., *Durham v. Kelley*, 82 F.4th
217, 227–29 (3d Cir. 2023); but see *Bennett-Nelson v. Louisiana Bd. of Regents*,
431 F.3d 448, 455 (5th Cir. 2005) (explaining that "having already held that
sovereign immunity does not bar the appellants' claim under [the Reha-
bilitation Act], we need not address at this juncture the issue of abrogation
under Title II of the ADA, because the rights and remedies under either
are the same for purposes of this case").

conflicts in the evidence and all reasonable inferences in his favor. *Navratil*, 101 F.4th at 518. Summary judgment is appropriate when the moving party shows there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A dispute of material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021), quoting *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016).

A. *Legal Standard*

McDaniel contends that the Wisconsin Department of Corrections violated the ADA and the Rehabilitation Act by refusing to accommodate his physical impairments, resulting in the denial of access to programs and services. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act provides: "No otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The relief available under the ADA and the Rehabilitation Act is "coextensive." *Jaros*, 684 F.3d at 671. "'[C]ourts construe and apply [the statutes] in a consistent manner,' and our evaluation of [a plaintiff's] claims under both [requires] the same analysis." *A.H. ex rel. Holzmueller v. Illinois High School Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018),

quoting *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004).[10]

To avoid summary judgment under the ADA and the Rehabilitation Act, McDaniel must offer evidence that "(1) he is a qualified person (2) with a disability and (3) the Department of Corrections denied him access to a program or activity because of his disability." *Jaros*, 684 F.3d at 672. The Department disputes only the third element. If McDaniel offers evidence that could support a jury finding in his favor on that element, "the burden shifts to the [Department] to prove that the requested accommodation would impose an undue hardship." *Conners v. Wilkie*, 984 F.3d 1255, 1261 (7th Cir. 2021); see also *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002) ("An accommodation is unreasonable if it imposes undue financial or administrative burdens or requires a fundamental alteration in the nature of the program.").[11]

---

[10] There are a few differences between the ADA and the Rehabilitation Act, but they do not affect the merits of McDaniel's claims at summary judgment. See *Jaros*, 684 F.3d at 671 (Rehabilitation Act claim requires as additional element the receipt of federal funds, which all states accept for their prisons); see also, e.g., *Reed v. Columbia St. Mary's Hospital*, 915 F.3d 473, 484 (7th Cir. 2019) (noting key difference between ADA and Rehabilitation Act regarding defendant's intent).

[11] Reasonable accommodation claims under Title II of the ADA and Section 504 of the Rehabilitation Act are firmly part of both statutes, even though they do not contain specific language on point. See *A.H.*, 881 F.3d at 592 ("While Title II and Section 504 of the Rehabilitation Act lack such specific reasonable accommodation language, their corresponding regulations employ language indicating that entities must provide reasonable accommodations to the disabled."); see also *Reed*, 915 F.3d at 484 ("The Rehabilitation Act does not contain an explicit accommodation

It is well established that "[r]efusing to make reasonable accommodations is tantamount to denying access." *Jaros*, 684 F.3d at 672. Just as an employer is not obliged to provide an employee with a disability the particular accommodation he requests or prefers, *Mobley v. Allstate Insurance Co.*, 531 F.3d 539, 546 (7th Cir. 2008), prison officials are not required to provide a prisoner with disabilities the particular accommodations he requests or prefers. Rather, "the [defendant] need only provide some reasonable accommodation," *id.* (internal quotation omitted), that ensures that the person with disabilities has "equal access to the benefits of" programs or activities. See *Wisconsin Community Services, Inc. v. City of Milwaukee*, 465 F.3d 737, 748 (7th Cir. 2006) (en banc) (zoning restrictions affecting health care for persons with disabilities, addressed under Rehabilitation Act and Title II of ADA).

In a prison, qualifying programs and activities include meals, medical care, showers, toilets, and the like. See *Georgia*, 546 U.S. at 157; *Jaros*, 684 F.3d at 672. Whether an accommodation satisfies these requirements is a "highly fact-specific inquiry," whether in employment or in prison. See *McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 968 (7th Cir. 2020) (internal quotation omitted).

To win compensatory damages under the statutes, McDaniel must also offer evidence that the Department of Corrections was intentionally discriminatory or at least deliberately indifferent to its violation. *Lacy v. Cook County*, 897 F.3d 847, 862–63 (7th Cir. 2018) (agreeing with most circuits that deliberate indifference is sufficient to prove intentional

---

requirement, but the Supreme Court has located a duty to accommodate in the statute generally.").

discrimination under failure-to-accommodate claims). That requires "both (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood." *Id.* at 863, quoting *S.H. ex rel. Durrell v. Lower Merion School District*, 729 F.3d 248, 263 (3d Cir. 2013) (internal quotation omitted).[12]

### B. *Reasonable Accommodations*

McDaniel asserts that the Department of Corrections failed to provide reasonable accommodations by denying him (1) a no-stairs unit, (2) a single-occupancy wet cell, and (3) a cell without a top bunk. We take these issues in turn.

#### 1. *No-Stairs Unit*

After McDaniel was transferred to Columbia, Dr. Syed removed his low-tier, no-stairs restriction upon a recommendation by the physical therapist who evaluated McDaniel. He was then placed in a cell in a unit that would require him to go up and down stairs in his daily activities. We assume that the initial cell assignment was reasonable at first. The healthcare professionals at the facility believed McDaniel needed to use stairs to improve mobility and to avoid atrophy after his recent spinal surgery. That accommodation was also in line with the spinal surgeon's post-operative instructions. The question for us, however, is whether the denial of a no-stairs unit became unreasonable after McDaniel's problems accessing services became evident and the Department still refused his repeated requests for a no-stairs unit.

---

[12] A plaintiff can win compensatory damages under the Rehabilitation Act but not damages for emotional distress. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 230 (2022).

On this record, the evidence on denial of access is sufficient to defeat summary judgment for the Department. McDaniel needed to make his way up and down stairs to participate in various prison programs and activities, including ones as basic as meals and medical care. McDaniel offered evidence that, during his year at Columbia, he missed some 600 meals and many doses of his medications because the stairs—which he often could not climb or descend due to the pain of doing so—impeded his access. Accommodations must give "meaningful access to the benefit that the grantee offers." *Alexander v. Choate*, 469 U.S. 287, 301 (1985). A reasonable jury could find that missing nearly two meals a day on average meant McDaniel did not have "meaningful access" to meals. The same is true of his access to medications. On this record, a reasonable jury could find that requiring McDaniel to walk up and down stairs for meals and medications was not reasonable.

The district court, however, found that McDaniel's cell assignment was reasonable because he was physically able to walk up and down stairs to access prison programs, even if it was more painful to do so. The court pointed to the fact that some prison officials had observed McDaniel managing to go up or down stairs a few times. That reasoning may or may not be persuasive at trial, but it is not consistent with the summary judgment standard. McDaniel presented evidence that he could not navigate the stairs often enough to meet his basic needs on a daily basis. He also explained that the occasions when prison officials had observed him navigate the stairs were the rare times that he tried the stairs to request accommodations or to avoid starvation.

Giving McDaniel the benefit of conflicting evidence, we cannot say beyond reasonable dispute that the Department was reasonable in choosing to keep housing him in a unit requiring him to go up and down stairs many times each day to gain access to prison programs, benefits, and services, including meals and medications. Ample evidence could support a jury finding of the exact opposite—that it was unreasonable to refuse McDaniel's requests to be placed in a no-stairs unit. That holds true even if McDaniel could and did manage to go up and down stairs occasionally, and often with help.[13]

The district court also suggested that McDaniel's walker was an adequate accommodation for the stair problem, so that McDaniel was not denied access to programs or services by living in a unit with stairs. Applying the summary judgment standard, we again must disagree. McDaniel offered evidence that his walker weighed about twenty-five pounds, and he was directed not to lift more than ten pounds. He also provided evidence that he could not use the walker to move up and down stairs and often relied on other prisoners to carry his walker for him so he could hold onto the railing. If a prisoner needs help from other prisoners to access programs, however, the general rule is that the accommodation is ineffective and inadequate. *Wright v. New York State Dep't of Corrections*, 831 F.3d 64, 74, 79 (2d Cir. 2016) (reversing summary judgment for defense); see also *American Council of the Blind v.*

---

[13] The evidence McDaniel offered that he had access on average to only one meal per day is consistent with prison officials noting they sometimes saw McDaniel using the stairs successfully. The issue is whether a reasonable jury would be required to find that McDaniel's access to only one meal per day constituted "meaningful access" to the relevant prison program, meals. See *Alexander*, 469 U.S. at 301.

*Paulson*, 525 F.3d 1256, 1269, 1274 (D.C. Cir. 2008) (affirming summary judgment for plaintiff; Rehabilitation Act's emphasis on self-sufficiency should ensure that "enjoyment of a public benefit is not contingent upon the cooperation of third persons"). The walker aided McDaniel in attending meals only if a friend carried the walker up the stairs, which then allowed him to use the walker to move freely around the cafeteria. A reasonable accommodation cannot be one that requires the aid of other prisoners.[14]

### a.   *Medical Judgment?*

The Department contends that the decision to house McDaniel in a unit with stairs was a form of medical treatment, which it says dooms his claim. As a general matter, the ADA and the Rehabilitation Act do not apply to issues of allegedly inadequate medical treatment. See *Reed*, 915 F.3d at 486 n.6 ("The Rehabilitation Act and the Americans with Disabilities Act do not create a remedy for medical malpractice."); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (explaining that ADA is not violated by "a prison's simply failing to attend to the medical needs of its disabled prisoners").

As the Department sees the issue, McDaniel must prove that medical decisions had no bearing on the denials of his accommodation requests for a no-stairs unit because otherwise he cannot show that he was denied access to programs or services because of his disability. A contrary rule, the Department says, "would lead to the absurd result of creating litigation risk whenever medical staff deny [a prisoner's]

---

[14] The cane likewise failed to solve the problem. It required McDaniel to walk with a cane while also carrying his walker. McDaniel contends that he could not use or carry both simultaneously.

requested treatment based on their medical judgments and observations." In this case, the Department contends, it denied McDaniel a no-stairs unit because it was deferring to the reasoned medical judgment of the facility's staff that he did not need such a restriction.

The Department's general point is correct. When prisoners are unhappy with the medical care they have received, legal redress may be available through medical malpractice suits or Eighth Amendment suits, not under the ADA or the Rehabilitation Act. But when it comes to issues of mobility affecting access to programs (here, principally meals and medical care), that argument runs against the weight of recent authority, at least as applied to McDaniel's evidence.

Starting with the Supreme Court, in *Georgia*, the Court addressed whether a prisoner with a disability in state prison could sue the state for damages under Title II of the ADA. 546 U.S. at 153. When discussing whether the conduct at issue violated the Act in the first place, the Court explained that an "alleged deliberate refusal of prison officials to accommodate [a plaintiff's] disability-related needs *in such fundamentals as mobility*" could constitute an ADA violation because those decisions could lead to the "'exclu[sion] from participation in or … deni[al of] the benefits of' the prison's 'services, programs, or activities.'" *Id.* at 157 (alterations and omission in original; emphasis added), quoting 42 U.S.C. § 12132. That statement clearly assumes that the ADA and the Rehabilitation Act address mobility issues that affect a prisoner's ability to participate equally in programs and services, even if they might also relate to medical decisions. At the very least, those decisions are not entirely off-limits from scrutiny under the ADA and Rehabilitation Act.

Since *Georgia*, other circuits have treated decisions related to a prisoner's mobility as disability accommodation issues, not just as issues of allegedly inadequate medical treatment, even when medical staff were directly involved in denying a prisoner a claimed reasonable accommodation.

For example, in *Wright*, the Second Circuit treated the decision to deny a prisoner a motorized wheelchair as an accommodation issue. 831 F.3d at 69, 74. Wright had received a "quad cane, a manual wheelchair, use of his customized cushion, knee pads, wheelchair accessible living space, and access to mobility aides from the mobility assistance program." *Id.* at 73. But he testified that even with those accommodations, he was "unable to visit the law library," "missed multiple morning sick calls, doctor appointments, and meals," and "defecated or urinated on himself on more than one occasion" because he could not reach the bathroom quickly enough. *Id.*

The court found it obvious that these shortcomings were "examples of Wright being denied meaningful access to prison services, programs, and activities." *Id.* The court also took particular issue with Wright's forced reliance on other prisoners to navigate prison programs, which was "fundamentally in tension with the ADA and [the Rehabilitation Act's] emphasis on independent living and self-sufficiency." *Id.* at 74–75 (internal quotation omitted). The Second Circuit reversed summary judgment for the defendants, concluding that a reasonable jury could find that a motorized wheelchair was a reasonable accommodation.[15]

---

[15] The Department of Corrections tries to distinguish *Wright* because the prison there failed to engage in an individual assessment of the prisoner's needs when it denied him a wheelchair. In *Wright* the prison had

In another similar case, the Fifth Circuit recognized the ADA could offer relief for a denial of accommodations the plaintiff needed to move within a jail. In *Cadena v. El Paso County*, 946 F.3d 717 (5th Cir. 2020), Cadena was incarcerated for failing to appear in court. Three days before her arrest, she had undergone surgery on her right leg. She used a wheelchair as she recovered. Upon arrival at the jail, a nurse conducted an intake evaluation. The nurse determined that Cadena could stand "independently" because she had "stood during the intake when asked to do so." *Id.* at 721. Cadena, however, told the nurse that she could not walk, given her recent surgery. The facility physician decided that Cadena needed crutches but not a wheelchair. The facility also denied her requests for "a modified food delivery procedure, and various forms of medical care." *Id.* at 725. At least one person, but not the treating physician, told Cadena that the facility could not accommodate a wheelchair.

The crutches, like the stairs for McDaniel, created problems for Cadena from the start. She could not safely navigate the facility on crutches and told staff members at least three times that she needed a wheelchair. One officer testified that she saw Cadena fall as she tried to use the crutches. The crutches also impeded her ability to access meals. She could

---

maintained a blanket policy banning motorized wheelchairs. Here, by contrast, McDaniel was evaluated many times by prison staff, and they determined his requested accommodations were not medically necessary. Whether individualized assessments occurred, however, does not resolve the issue of whether the accommodations resulting from such assessments were reasonable. Defendants cannot avoid liability under the statutes by conducting individualized assessments if the result is a failure to provide reasonable accommodations ensuring meaningful access to programs or activities. This is an issue for trial.

not carry her food tray and use the crutches at the same time. But jail officials "continued to refuse the requested accommodation despite indications that further accommodation was necessary." *Id.* at 726.

In reversing summary judgment for the defense on the reasonable accommodation issue, the Fifth Circuit rejected the defendant's argument that it properly deferred to the physician's "medical judgment that Cadena did not need a wheelchair." *Id.* The court first explained that the Supreme Court and the Second Circuit had treated "mobility aids" as "disability accommodations." *Id.*, citing *Georgia*, 546 U.S. at 157, and *Wright*, 831 F.3d at 73. In addition, there were reasons to doubt whether the physician actually intended for Cadena not to have access to a wheelchair, and other staff had explicitly recommended that she receive one. Thus, "the [defendant's] characterization that it was merely deferring to a reasoned medical judgment [was] inaccurate." *Id.* at 727.

These cases indicate a general principle that decisions impeding a prisoner's ability to move freely throughout a facility and discouraging his participation in prison activities can be addressed under the ADA and the Rehabilitation Act. See also *Koon v. North Carolina*, 50 F.4th 398, 401–02, 405–06 (4th Cir. 2022) (treating medical professionals denying prisoner a handicap pass to use library without climbing stairs as an accommodation issue under the ADA); *Brooks v. Colorado Dep't of Corrections*, 12 F.4th 1160, 1164–65, 1172 (10th Cir. 2021) (reversing summary judgment for defendants under ADA; trial required to decide whether provision of adult diapers was a reasonable accommodation for prisoner with ulcerative colitis that caused him to miss hundreds of meals per year after prison's clinical services denied prisoner a movement pass

that would have allowed him to access meals more flexibly); see also *Furgess v. Pennsylvania Dep't of Corrections*, 933 F.3d 285, 291 (3d Cir. 2019) (explaining "complaints about not being provided an accessible shower are not allegations of medical malpractice or disagreements about medical treatment. They are requests for reasonable accommodations so that inmates with disabilities can take a shower—just like able-bodied inmates"). Such claims are not barred as a matter of law even if the denial of an accommodation can be described in some respects as a "medical decision."

Our decision in *Bryant*, 84 F.3d at 246, does not conflict with this view; the case is readily distinguishable from this situation. Bryant was a prisoner with paraplegia. He sued a prison after it had refused his request for guardrails for his bed and as a result, he fell out of his bed and broke his leg. Bryant also complained that he was denied medication after surgery to fix his broken leg. Bryant argued these actions violated, in part, the ADA. We rejected his claim.

We emphasized two important points. First, Bryant had not complained "of being excluded from some prison service, program, or activity." *Id.* at 249. Instead, he took issue with "incompetent treatment of his paraplegia," which the ADA does not address. *Id.* Second, we emphasized that "[s]tandards of medical care are not irrelevant to the [ADA]. Disabled people often cannot participate in programs and activities unless special attention is given to their medical needs." *Id.* That was not Bryant's case because he did not claim he was denied access to a program or activity. McDaniel, by contrast, has offered evidence that he was in fact denied

access to qualifying programs and services because the Department refused to assign him to a no-stairs unit.[16]

We read these cases, taken together, as establishing a few general principles. First, the ADA and the Rehabilitation Act do not apply when a prisoner simply disagrees with his course of medical treatment. Second, simple disagreement with treatment is different from cases where, as here, a plaintiff offers evidence that the choice to reject his accommodation requests directly affected his mobility, preventing him from moving freely throughout the facility and impairing or preventing his participation in prison activities. "Disabled people often cannot participate in programs and activities unless special attention is given to their medical needs." *Bryant*, 84 F.3d at 249. Consistent with *Georgia* and the later circuit cases cited above, the evidence here raises issues under the ADA and the

---

[16] The Department also relies on *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005), but the situation there is also readily distinguishable from McDaniel's mobility issues. Fitzgerald broke his hip while incarcerated. The treating physician advised the prison that a surgical procedure was the best form of treatment, but that another acceptable course of treatment was to do nothing. The facility chose to do nothing. Fitzgerald sued, asserting that the physician's recommendation that the facility may "do nothing" violated his rights under the ADA and the Rehabilitation Act. The Tenth Circuit rejected his claim, explaining that a surgery is something that Fitzgerald "would not have been 'otherwise qualified' for … in the absence of his alleged disability." *Id.* at 1144. Whether to have surgery or not was "the sort of purely medical decision[] that we have held [does] not ordinarily fall within the scope of the ADA or the Rehabilitation Act." *Id.* Fitzgerald did not argue that he was denied access to a program or service because of his disability. The sole issue was his disagreement with the treatment he received.

Rehabilitation Act, not just medical malpractice or Eighth Amendment health-care claims.

Whether to house McDaniel in a unit with stairs presented an accommodation issue since it directly related to his mobility. If McDaniel could not access the cafeteria if he lived in a unit with stairs but could if he lived in a unit without them, then a no-stairs restriction could qualify as a mobility aid. The choice to assign him to a unit with stairs affected his ability to move freely around the prison, and, according to McDaniel's evidence, resulted in his missing 600 meals in one year, as well as many doses of medications.

McDaniel has shown a material dispute as to whether housing him in a unit with stairs was a reasonable accommodation. McDaniel never claimed he was incapable of ever making his way up and down stairs. His case has always been that stairs were too difficult and painful for him to access meals and medications on a regular basis. The Department's justification that the cell assignment was necessary because movement, like walking up and down stairs, could help McDaniel avoid developing muscle atrophy does not compel summary judgment in its favor. Even if the decision was reasonable when McDaniel was first transferred and was recovering from his spinal surgery, McDaniel's evidence shows that as time went on, he struggled to the point that he was missing medications and an average of two meals a day. Faced with that evidence, a jury could find that it eventually became unreasonable for the prison to deny a non-stairs assignment. We recognize, of course, that doctors often give treatment instructions that patients do not agree with and may even find painful, such as stressing movement after surgery. But our task is assessing whether McDaniel received

meaningful access to prison programs, and to make that as-sessment by giving McDaniel the benefit of conflicts in the ev-idence. As months went by and he was relegated to asking other prisoners for assistance or even scooting up and down stairs on his buttocks for meals, medications, and other ser-vices, there is a genuine factual dispute over whether the cell assignment continued to be reasonable.

McDaniel has offered evidence to establish a prima facie case that denying him a no-stairs unit amounted to a failure to accommodate his disabilities. The Department has not ar-gued that McDaniel's requested accommodation—a no-stairs unit—would have imposed an undue hardship on prison of-ficials. McDaniel's evidence thus supports a triable claim that the Department violated his rights under the ADA and the Rehabilitation Act during his time at Columbia.

### b. *Compensatory Damages*

The next issue is whether a reasonable jury could award McDaniel compensatory damages, which, under the ADA and Rehabilitation Act, would require a finding that the De-partment was at least deliberately indifferent to his lack of ac-cess. *Lacy*, 897 F.3d at 863. Deliberate indifference, again, re-quires that "the defendant *knew* that harm to a federally pro-tected right was substantially likely and … *failed* to act on that likelihood." *Id.* at 862 (omission and emphases in original; in-ternal quotation omitted).

As explained, McDaniel offered evidence that the stairs prevented his access to meals and medication. He and the de-fendants also offered evidence that he conveyed that fact re-peatedly to various facility staff members during his year at Columbia. All his requests for a no-stairs unit were denied,

and his cell assignment went unchanged. A reasonable jury could find that the Department, by refusing to change McDaniel's disability-related restrictions and to place him in a no-stairs unit, even after knowing he was missing meals and medication dosages, was deliberately indifferent to violations of McDaniel's "federally protected right[s]" under the ADA and the Rehabilitation Act. *Id.* (internal quotation omitted). At bottom, McDaniel has offered enough evidence to defeat summary judgment on this failure-to-accommodate claim for money damages. We reverse the district court's decision to the contrary.

      c. *Eleventh Amendment Sovereign Immunity and the Eighth Amendment's Prohibition on Cruel and Unusual Punishment*

Having set out the merits of McDaniel's reasonable-accommodation claim regarding the denial of a no-stairs unit, we return to the issue of sovereign immunity. If a reasonable jury could conclude that one or more responsible prison officials were deliberately indifferent to McDaniel's federally protected rights under the ADA, then a reasonable jury could also find that same conduct violated the Eighth Amendment. This point is important, because it means that, for purposes of McDaniel's ADA Title II claim for money damages, Congress could validly abrogate state sovereign immunity under the Eleventh Amendment. See *Georgia*, 546 U.S. at 159 ("[I]nsofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." (emphasis original)).

We discuss below McDaniel's Eighth Amendment claim against Dr. Syed for deliberate indifference to medical needs.

McDaniel's Title II ADA claim is comparable to a "conditions of confinement" claim under the Eighth Amendment. See *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (explaining that Eighth Amendment imposes duties on prison officials to "provide humane conditions of confinement").

"Adequate food and facilities to wash and use the toilet are among the 'minimal civilized measure of life's necessities' that must be afforded prisoners." *Jaros*, 684 F.3d at 670, quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), and citing *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). The Supreme Court has recognized that the food prisoners are fed is a "condition" of confinement. *Wilson*, 501 U.S. at 303. Prison officials are liable under the Eighth Amendment for depriving an inmate of humane conditions of confinement if the official is deliberately indifferent to a substantial risk of harm from that deprivation. See *Farmer*, 511 U.S. at 837.

We explained above why a reasonable jury could conclude that prison officials were deliberately indifferent to McDaniel's lack of access to prison programs, including meals. We also think it obvious that depriving a prisoner of nearly two meals a day for an entire year can amount to a substantial risk of harm. See *Reed v. McBride*, 178 F.3d 849, 853–54 (7th Cir. 1999) (reversing summary judgment; prisoner missing meals three to five days at a time was a "sufficiently serious" deprivation to constitute an Eighth Amendment violation); accord, *Foster v. Runnels*, 554 F.3d 807, 812–13 (9th Cir. 2009) (reversing summary judgment; depriving prisoner of sixteen meals in twenty-three days was sufficiently serious deprivation of a life necessity to establish Eighth Amendment violation); *Simmons v. Cook*, 154 F.3d 805, 807–09 (8th Cir. 1998) (upholding damage award for Eighth Amendment violation where

paraplegic prisoners missed four consecutive meals because their wheelchairs could not access food tray slots, depriving them of "the minimal civilized measure of life's necessities," quoting *Farmer*, 511 U.S. at 834); *Cooper v. Sheriff, Lubbock County*, 929 F.2d 1078, 1083 (5th Cir. 1991) (deprivation of adequate food for significant periods of time is a "form of corporal punishment" forbidden by the Eighth Amendment). Because the conduct that supports McDaniel's Title II ADA claim would also amount to a violation of the Eighth Amendment, the Eleventh Amendment does not bar him from seeking money damages against the Wisconsin Department of Corrections. He is seeking recompense for an actual constitutional violation.

### 2. *Single-Occupancy Wet Cell*

We turn now to McDaniel's assertion that placing him in a double-occupancy cell failed to accommodate his disabilities. Again, to survive summary judgment on this issue, McDaniel needed to offer evidence that the Department of Corrections denied him access to a program or activity because of his disability. Unlike his claim for a no-stairs unit, this claim presented a medical treatment dispute. Relief is not available under the ADA and the Rehabilitation Act, and the district court properly granted summary judgment on the claim.

McDaniel contended that the double-occupancy wet cell was not a reasonable accommodation for his incontinence and therefore impeded his access to the toilet. Staff at Columbia denied McDaniel's request for a single-occupancy cell because they did not believe one was medically necessary. These conflicting positions indicate the core dispute was and continues to be over the best treatment of incontinence, not McDaniel's access to a toilet.

We draw our understanding from the nephrologist herself, whose recommendations McDaniel relies upon here. She said that the "current single[] cell is providing him this option [to do timed voiding] and I would recommend this to continue as to avoid further complications and stress associated with" incontinence; and in a follow-up, "single cell status was previously significantly helpful in minimizing issues and stress surrounding bowel and bladder concerns." Her recommendations for a single-occupancy cell were based on what she believed McDaniel needed to treat his incontinence issues and to practice timed voiding. The Department denied McDaniel a single-occupancy cell because it disagreed with the nephrologist and McDaniel that one was medically necessary. These disagreements are more akin to *Bryant* and that plaintiff's concerns with the prison's alleged "incompetent treatment of his paraplegia." 84 F.3d at 249. In this case, McDaniel took issue with what he saw as incompetent treatment of his incontinence. This seems more like a treatment issue, not an accommodation issue.

McDaniel tried to present this issue as one regarding toilet access, but we are not convinced. McDaniel testified that he would often fall off the toilet because he could not access it with his walker, which he needed for balance, when the courtesy screen was up in his cell. If a prisoner could not access a toilet because the bathroom could not accommodate a wheelchair, for instance, that could present potential issues under the ADA and the Rehabilitation Act. See *Georgia*, 546 U.S. at 155, 157 (ADA violation was "quite plausible" since bathroom was not equipped for wheelchair access). If the concern were simply the courtesy screen blocking his ability to access the toilet, that would be one thing. But McDaniel went a step further: he contended the only way to remedy this situation was

to give him his own cell with his own toilet, not just so that he could use his walker while using the toilet, but so that he could practice timed voiding. McDaniel's proposed solution constitutes a form of medical treatment for his incontinence. This reasoning undermines McDaniel's attempt to characterize this claim as an access issue.

### 3. *No Top Bunk*

McDaniel contended further that having a bed with a top bunk failed to accommodate his disabilities. McDaniel had a lower bunk. While he hit his head on the top bunk a few times when getting into his bed, he has not offered evidence that the top bunk prevented him from accessing programs or services. To the extent the pain specialists believed McDaniel should have had a bed without a top bunk, that decision was related to decreasing the number of opportunities where McDaniel might aggravate his pain. That rationale does not show a denial of access to programs or services. A reasonable jury could not find that the top bunk prevented or discouraged his participation in prison activities.

To summarize our conclusions under the Rehabilitation Act and the ADA, McDaniel met his burden to defeat summary judgment on the theory that the Department of Corrections failed to accommodate and was deliberately indifferent to his disability-related needs when it denied him a cell in a unit that would not require him to go up or down stairs for routine activities. We reverse the district court's grant of summary judgment on that claim. We affirm the court's grant of summary judgment on the other claims under those statutes.

V. *Eighth Amendment Claim Against Dr. Syed*

We turn now to McDaniel's Eighth Amendment claim against Dr. Syed, a physician at the Columbia Correctional Institution. According to McDaniel, Dr. Syed expressed skepticism toward him in their first interaction, saying he could not "possibly have" all his diagnosed medical issues. Later, however, Dr. Syed referred McDaniel to the Waupun Memorial Hospital pain clinic in response to his complaints. Dr. Syed continued to treat McDaniel, prescribing new medications when necessary and refusing others after concluding that McDaniel was likely engaging in "attention-seeking and drug-seeking behavior." Dr. Syed did not alter the disability restrictions in McDaniel's file at any point.

McDaniel contended that Dr. Syed was deliberately indifferent to his medical needs in two ways: first, by failing to follow medical recommendations of outside specialists, and second, by failing to change his course of treatment when it was not adequately treating McDaniel's pain. Given the demanding standard under the Eighth Amendment, a reasonable jury could not find for McDaniel on either theory.

A. *Legal Standard*

The Eighth Amendment prohibits "cruel and unusual punishment" of a prisoner. It is well established that a prison official's "deliberate indifference" to a prisoner's "serious medical needs" violates that mandate. *Farmer*, 511 U.S. at 835 (internal quotation omitted); *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015). To support a claim of deliberate indifference, McDaniel needed to offer evidence that (1) he had an objectively serious medical condition, and (2) Dr. Syed acted with deliberate indifference to that condition. See *Petties v.*

*Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc). Dr. Syed disputes only the second element.

Deliberate indifference depends on the defendant's "subjective state of mind." *Id.* The question is whether McDaniel provided evidence to support a finding that Dr. Syed "*actually* knew of and disregarded a substantial risk of harm." *Id.* (emphasis in original); see also *Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). Negligence or even objective recklessness—the "fail[ure] to act in the face of an unjustifiably high risk that is so obvious that it *should* be known"—is not enough to satisfy that standard. *Petties*, 836 F.3d at 728 (emphasis in original).

Under the Eighth Amendment, a medical professional who has treated a prisoner "is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019), quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (internal quotation omitted). To violate the Eighth Amendment, a treatment decision must be "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain*, 512 F.3d at 895, quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998). Equally important, however, the "receipt of *some* medical care does not automatically defeat a claim of deliberate indifference if a fact finder could infer the treatment was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' a medical condition." *Edwards v.*

*Snyder*, 478 F.3d 827, 831 (7th Cir. 2007), quoting *Snipes v. De-Tella*, 95 F.3d 586, 592 (7th Cir. 1996); see also *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) ("a prisoner [does not] need to show that he was literally ignored").

B. *Disagreement with Specialists*

McDaniel first asserts that Dr. Syed was deliberately indifferent to his serious medical needs by acting contrary to the recommendations of outside specialists. Deliberate indifference can occur when a prison official acts contrary to the recommendations of specialists for non-medical reasons. See *Perez*, 792 F.3d at 778 (collecting cases). That is not what occurred here. The undisputed evidence shows that Dr. Syed's actions were based on "his own legitimate medical judgment[s]." *Id.* at 779; see *Estate of Cole v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996) ("Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference."). McDaniel has not offered evidence that the care he received was "blatantly inappropriate" or that Dr. Syed's decisions were "substantial departures from accepted professional judgment, practice, or standards."

Take the no-stairs issue first. Dr. Syed agreed to discontinue McDaniel's no-stairs restriction after a physical therapist made that recommendation shortly after McDaniel arrived at Columbia. McDaniel argues that by including certain restrictions in the post-operative instructions (which preceded his transfer), the spinal surgeon effectively recommended that he live in a unit that would not require him to go up and down stairs routinely. McDaniel contended that a reasonable jury could find that Dr. Syed was deliberately

indifferent to his medical needs by acting against that sup-posed recommendation.

There are several problems with this argument. First, it is not clear that the post-operative instructions support McDan-iel's position. He points to the instruction that said he should lift no more than five to ten pounds. McDaniel asserted under penalty of perjury that his walker weighed twenty-five pounds (recall it had four wheels and an attached chair). But for this argument to have traction, Dr. Syed would have needed to have been aware of that weight and to have under-stood that McDaniel needed to use the walker to go up and down stairs, requiring him to lift more than ten pounds each time. (Recall that as part of the evaluation, the physical thera-pist had McDaniel walk up and down six stairs without the aid of a walker, which he did successfully. Dr. Syed consulted these notes in changing McDaniel's restrictions.) Putting those evidentiary holes aside, the post-operative instructions also said that McDaniel may "climb stairs." A reasonable jury could not find that Dr. Syed acted with deliberate indifference to McDaniel's serious medical needs by agreeing with the spi-nal surgeon's suggestion that McDaniel could "climb stairs."

Next, consider the recommendation by the outside pain specialist that McDaniel live in a cell without a top bunk. McDaniel contends that the top bunk exacerbated his pain be-cause he would often hit his head on the bunk due to his lim-ited mobility in his back and that his cellmate would some-times hit him getting in and out of bed. When McDaniel com-plained of these issues to the Health Services Unit, staff mem-bers were not able to corroborate his complaints. Dr. Syed as-sessed McDaniel's condition and did not believe that a no-top-bunk restriction was medically necessary. McDaniel has

not offered evidence that Dr. Syed's conclusion was a substantial departure from acceptable professional standards, even if it did conflict with the outside pain specialist's recommendation. *Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012) ("[T]he prison physician, as the [prisoner's] acting primary care doctor, is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards.").

Finally, McDaniel points to the recommendation by the nephrologist that he live in a single-occupancy wet cell to aid in his timed voiding. At an appointment a few months into his stay at Columbia, McDaniel told Dr. Syed that he had issues with "fecal incontinence" and that he had "problems [with] cell[mate] when defecating." Dr. Syed did not change McDaniel's cell assignment. Then, a nephrologist visited McDaniel twice and concluded that a single-occupancy wet cell would help treat his incontinence issues. Dr. Syed, however, continued the same course of treatment: diapers and a double-occupancy cell with a toilet. Other Health Services staff agreed with Dr. Syed that McDaniel's cell assignment did not need to change.

McDaniel has again failed to introduce a disputed fact that Dr. Syed's decision was devoid of medical judgment or to show that the prison was required to adopt the nephrologist's recommendation. Deliberate indifference is a demanding standard, and McDaniel did not offer evidence that Dr. Syed's decision to keep his treatment the same was a substantial departure from acceptable professional standards. *Snipes*, 95 F.3d at 592 ("[T]he Constitution is not a medical code that

mandates specific medical treatment.”). The recommendations by the nephrologist do not support such a conclusion on their own. See *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 484–85 (7th Cir. 2022) (disagreement among physicians did not, without more, establish reckless disregard for patient harm and pain required for constitutional violation).

C. *Pain Treatment*

McDaniel also asserted that a reasonable jury could find that Dr. Syed was deliberately indifferent to his pain. We disagree. “[T]he Eighth Amendment does not entitle incarcerated patients to their preferred pain medication, nor does it impose the unrealistic requirement that doctors keep patients completely pain-free.” *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 681 (7th Cir. 2023) (internal citations omitted).

In response to McDaniel’s complaints of pain early in his stay at the Columbia Correctional Institution, Dr. Syed referred him to the Waupun Memorial Hospital pain clinic. He also prescribed McDaniel new medications to help address his pain. Later, Dr. Syed assessed McDaniel, concluded that he was likely engaging in “attention-seeking and drug-seeking behavior,” and refused to change his medications. Dr. Syed said that his conclusion was based on his medical assessment, a past cardiac work-up, and how McDaniel presented himself during their interaction. “The administration of pain killers requires medical expertise and judgment. Using them entails risks that doctors must consider in light of the benefits.” *Snipes*, 95 F.3d at 591.

McDaniel has again not offered evidence that Dr. Syed’s decision constituted a substantial departure from acceptable professional standards or that the treatment he did receive

was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005), quoting *Snipes*, 95 F.3d at 592; see also *Lee v. Young*, 533 F.3d 505, 511 (7th Cir. 2008) ("Prison officials are expected to act responsibly under the circumstances that confront them but are not required to act flawlessly." (internal quotation omitted)). That strikes us as especially true when other staff members in the Health Services Unit came to similar conclusions regarding McDaniel's care. Cf. *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (doctor not deliberately indifferent when decision to forgo MRI was "implicitly endorsed by every other doctor who examined [the plaintiff]").

*          *          *

The district court's grant of summary judgment for the Department on McDaniel's ADA and Rehabilitation Act failure-to-accommodate claim based on the denial of a no-stairs unit at the Columbia Correctional Institution is REVERSED. In all other respects the judgment of the district court is AFFIRMED, and the case is REMANDED for proceedings consistent with this opinion.

BRENNAN, *Circuit Judge*, concurring in part and dissenting in part. My colleagues and I agree that the defendants are entitled to summary judgment on most of Carl McDaniel's case. We part ways on his claim under Section 504 of the Rehabilitation Act, as applied to the denial of his placement in a no-stair unit during his incarceration at Columbia Correctional Institution. Because review is limited to the evidence that was properly before the district court, I would affirm the district court's grant of summary judgment to the defendants in full.

The district court correctly concluded that McDaniel's submissions disregarded the local rules. McDaniel did not even try to identify the evidence on which he now relies for his claim to be housed in a no-stair unit. The district court declined to scour the record. Instead, it considered McDaniel's responses to the defendants' proposed facts and his own proposed facts only when they complied with the local rules. That decision was a matter within the district court's sound discretion.

## I

### A. Civil Local Rule 56 – Summary Judgment

Under our case law, district courts have broad discretion to compel compliance with their local rules governing summary judgment proceedings. These rules serve a crucial function for district judges, who face the difficult task of managing and prioritizing hundreds of cases and thousands of motions. In particular, the local rules on summary judgment require a party to direct the judge to the portions of the record that support the party's factual assertions or its opposition to those of its counterparty. *Hinterberger v. City of Indianapolis*, 966 F.3d 523, 529 (7th Cir. 2020). "The rules of each district court

structuring the summary-judgment process cannot serve their function if parties can later go to the court of appeals and secure a reversal based on evidence the district judge may not have known was present." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003).

In the Eastern District of Wisconsin, a party moving for summary judgment must file a statement of proposed material facts. Civil Local Rule 56(b)(1)(C). Each fact must be contained within its own separate, numbered paragraph. *Id*. The party opposing summary judgment must reproduce each numbered paragraph in the moving party's statement. Civil Local Rule 56(b)(2)(B). For any disagreement, the nonmovant must submit "specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon." *Id*. The nonmoving party also must file "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, declarations, parts of the record, and other supporting materials relied upon to support the facts described in that paragraph." Civil Local Rule 56(b)(2)(B).[1]

Time and again, we have recognized that district courts "may require strict compliance with their local rules." *Hinterberger*, 966 F.3d at 528; *see also Ammons v. Aramark Unif. Servs.*,

---

[1] The current iteration of Civil Local Rule 56 has been in effect since 2010. This court has upheld the enforcement of earlier versions of the rule, which date back decades. *See Huey v. United Parcel Serv., Inc.*, 165 F.3d 1084, 1085 (7th Cir. 1999) (upholding then-Civil Local Rule 6.05, which required the submission of specific evidentiary materials to dispute particular facts at summary judgment); *Kunik v. Racine Cnty., Wis.*, 106 F.3d 168, 171, 174 (7th Cir. 1997) (same).

*Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). When a district court decides that a litigant has violated those rules, we review that decision solely for abuse of discretion. *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 808–09 (7th Cir. 2005) (considering Northern District of Illinois Local Rule 56.1, closely analogous to the Eastern District of Wisconsin local rule here). And we have repeatedly stressed that district courts may decline to consider the noncompliant portions of submissions. "[A] court does not abuse its discretion when it opts to disregard facts presented in a manner inconsistent with the rules." *Fabriko Acquisition Corp. v. Prokos*, 536 F.3d 605, 607–08 (7th Cir. 2008) (upholding district court decision under predecessor E.D. of Wis. Civil Local Rule 56.2(b) to limit factual record when litigant failed to specify citations to evidentiary materials).

Contrary to McDaniel's arguments, requiring adherence to local rules is not empty formalism. Rather, it is essential to the proper functioning of the district courts. *Johnson*, 325 F.3d at 898. In our adversarial system of litigation, the parties have the duty to identify "what facts are truly disputed and may require resolution at a trial." *Hinterberger*, 966 F.3d at 529. A district court has no such duty. *Id.*

## B. McDaniel's Noncompliance

The defendants followed the local rule by submitting a 93-paragraph statement of proposed material facts. McDaniel's responses to those proposed facts failed to comply with the local rule. Few, if any, of McDaniel's responses cited affidavits, declarations, or specific portions of the record. Many responses contain no citation, while some list a vague authority such as "policy." That falls short under our case law. *See McKinney v. Off. of Sheriff of Whitley Cnty.*, 866 F.3d 803, 808–

09 (7th Cir. 2017); *Ammons*, 368 F.3d at 817–18 (stating that a denial "must include a specific reference to the affidavit or other part of the record. … Citations to an entire transcript of a deposition or to a lengthy exhibit are not specific and are, accordingly, inappropriate.").

Even in the few places where McDaniel's responses appear to reference specific documents, the responses do not tell the district court where to find those documents. Several of McDaniel's responses also improperly contain legal arguments. Many times, we have held that such responses violate local rules on summary judgment. *See Hinterberger*, 966 F.3d at 528–29; *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015); *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003); *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528–29 (7th Cir. 2000).

McDaniel's statement of additional material facts was also deficient. His submission includes some citations to documents in the record, but for the most part it does not contain facts, and instead quotes legal arguments made in the parties' briefs.

McDaniel points to two cases to argue that the district court should excuse his noncompliance, but neither is analogous. In *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394 (7th Cir. 2012), it was an abuse of discretion for the district court to refuse to consider evidence just because it was included in the nonmovant's statement of material facts but not in his accompanying memorandum of law. 686 F.3d at 397. There, the nonmovant "did not make the district court scour the record; he followed [the local rule] … and brought to the district court's attention the evidence in the record supporting his opposition

to summary judgment." *Id*. at 398. Here, though, McDaniel would have the district court search the record, and he did not follow Civil Local Rule 56(b)(2)(B). *Sojka* therefore does not help McDaniel.

Likewise, in *McKinney*, this court ruled that a district court abused its discretion by disregarding the "specific guidance" as to pertinent record evidence that the nonmovant provided at summary judgment. 866 F.3d at 808. There, the nonmovant provided the district court with "a detailed and organized guide to [the] evidence supporting his assertions of disputed facts and his legal arguments." *Id*. at 809. McDaniel provided no such detailed and organized guide, so the district court was within its discretion to disregard evidence that was not identified in compliance with the local rule.

Per McDaniel, the district court lacked discretion to enforce the local rule against him for two other reasons. The first is that McDaniel represented himself before the district court. The second concerns the district court permitting him to respond to the defendants' statement of material facts by submitting an affidavit or unsworn declaration.

Neither reason is persuasive. First, given the procedural history here, McDaniel was not entitled to special solicitude because he litigated pro se. The district court recruited an experienced, knowledgeable attorney to assist McDaniel with prosecuting his claims. But McDaniel became dissatisfied with his attorney's legal strategy, and he asked the court to terminate his services. The attorney therefore withdrew. McDaniel chose to litigate pro se, so he cannot use that status to claim an entitlement to disregard the district court's local rules. In any event, pro se litigants are not excused from complying with procedural rules, *Pearle Vision, Inc. v. Romm*, 541

F.3d 751, 758 (7th Cir. 2008), or court orders. *DJM Logistics, Inc. v. FedEx Ground Package Sys., Inc.*, 39 F.4th 408, 415 (7th Cir. 2022). That principle applies to rules governing summary judgment. *Zoretic v. Darge*, 832 F.3d 639, 641 (7th Cir. 2016) (citing *Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001)).

Second, the district court did not coax McDaniel into non-compliance with Civil Local Rule 56. To the contrary, the court advised him in a plain language Notice and Order that he "must support every disagreement with a proposed fact by citing to evidence." As McDaniel notes, the court allowed him to do so "by relying on documents that he attaches to his response or by telling the court his version of what happened in an affidavit or an unsworn declaration under 28 U.S.C. § 1746." But nothing in the court's Notice and Order excused McDaniel from providing "a detailed and organized guide to [the] evidence supporting his assertions of disputed facts and his legal arguments." *McKinney*, 866 F.3d at 809. McDaniel did not meet that standard. So, the district court was within its discretion to decide the summary judgment motion without first sifting through this case's extensive record to try to locate and examine evidence that McDaniel failed to identify or respond to.

## C. The Majority Opinion's View of the Facts

My colleagues conclude that the district court went too far with respect to one fact—that McDaniel missed meals because he was not assigned to a no-stairs unit. Because McDaniel signed all his summary judgment submissions under penalty of perjury, the majority opinion concludes that they provide a factual record that satisfies the applicable federal and local rules. Then the majority opinion pulls statements about the

meals missed from McDaniel's submissions, citing them as the evidence that survives summary judgment.

On review, though, the selected quotes from McDaniel's filings repeated in the majority opinion do not qualify as facts defeating summary judgment. All but one relate to claims different than his placement in a no-stairs unit.[2] The only statement the majority opinion cites that is connected to McDaniel's Rehabilitation Act claim[3] still violates Civil Local Rule 56(b)(2)(B) by failing to be a concise response to the movant's statement of facts that specifies references to the record relied upon.

---

[2] McDaniel's statement that he was "missing [h]undreds of state meals" is in R. 178 ¶ 46, his response to defendants' proposed findings of fact concerning his claim not to have a top bunk.

McDaniel's statement that the prison "denied [me] over 600 state meals" is in R. 179, his response to the declaration of Dr. Salam Syed, who played no role in McDaniel's ADA/Rehabilitation Act claim. This statement was in response to ¶ 26 of Dr. Syed's declaration about McDaniel's medications, not his request to be assigned to a no-stairs unit.

And McDaniel's statements that he "missed over 600 state meals in less than a year because of severe pain" and "Defendants were all aware of the ongoing constitutional violations of the [o]ver 600 … state meals" are from R. 177, his "Reply to Defense Argument," at pp. 10 and 12 of that filing, in its section concerning his conditions of confinement claim, not his Rehabilitation Act claim.

[3] McDaniel's statement that "[m]issing over 600 state meals because of severe unrelenting pain and being fed by modifying a program, which defendants never did, is not a comfort consideration, it is a "Life-Giving" requirement of the defendants" is from R. 177, his "Reply to Defense Argument," at p. 10 of that filing, in its section concerning his Rehabilitation Act claim.

The irony, of course, is that by not upholding the local rule, we are left performing the very task that rule is supposed to preclude—combing the record for statements and considering them as evidence on a dispositive motion.

A district court cannot ignore facts brought to its attention. But under the federal and local rules, parties must properly present the factual record for the court to resolve a summary judgment motion. This sorting function of parties identifying evidence for the court on a dispositive motion is critical. It forms the backbone of all the case law discussed above. It is not overly formalistic to ask that this requirement be complied with, something McDaniel failed to do. He certainly did not provide "a detailed and organized guide to [the] evidence supporting his assertions of disputed facts and his legal arguments," *McKinney*, 866 F.3d at 809, as this court requires.

My colleagues conclude that the declarations McDaniel added to each of his submissions rendered his missing-meals statement admissible evidence that precludes summary judgment on his no-stairs claim. Yet that conclusion fails to recognize the sorting function of the local rule. That rule's point is to focus the district court and the litigants on admissible evidence pertinent to the dispositive motion. If declarations can bootstrap into evidence all of a pro se litigant's submissions, the local rule is undermined.

Unlike my colleagues, I do not see the district court misapprehending that his declaration must itself incorporate affidavits, or that court failing to appreciate that McDaniel could rely on his own declaration. If the court did believe either of those things, it would not have worded the Notice and Order in the disjunctive:

> McDaniel must support every disagreement
> with a proposed fact by citing to evidence. He
> can do that by relying on documents that he at-
> taches to his response *or* by telling the court his
> version of what happened in an affidavit or an
> unsworn declaration … .

(emphasis supplied).

The majority opinion also criticizes the district court for holding McDaniel to an "unwritten requirement" by considering his submissions only to the extent they complied with the local rule. But this critique shifts from the litigant to the court the local rule's requirement to enumerate the applicable evidence. To demand more from the district court—per the majority, to "specify[] further the failures or the affected portions of plaintiff's submissions"—reads into the local rule an obligation that is not there. Failing to take a step that the local rule does not call for is not an abuse of discretion.

Beyond McDaniel's failure to affirmatively offer evidence to defeat summary judgment, he also failed to adequately contest several proposed factual findings which doom the no-stair-unit theory of his Rehabilitation Act claim. Most pertinent are three findings proposed by the defendants:

- A physical therapist at Columbia evaluated McDaniel's mobility in January 2018. During that assessment, McDaniel managed to ascend and descend six stairs, and the physical therapist decided he was safe to ambulate stairs. McDaniel agreed with that finding, though he argued that the physical therapist did not sufficiently account for safety.

- Michael Fink, a Corrections Unit Supervisor at Columbia, observed McDaniel successfully climbing the stairs more than once to report concerns. Again, McDaniel agreed this was true. His response referenced "the multiple times [he] did have to use stairs."

- McDaniel was "encouraged to get out of his cell for meals and use his cane for the stairs because muscle atrophy from lack of movement could result in the inability to walk in the future." For support, the defendants cited the declaration of Dr. Syed, a physician at Columbia who oversaw McDaniel's treatment and evaluated him several times. McDaniel failed to even acknowledge this proposed finding, declining to offer any response.

Because McDaniel did not competently dispute any of these facts, the district court was within its discretion to treat them as admitted. *See Fabriko Acquisition Corp.*, 536 F.3d at 607–08; *Cichon*, 401 F.3d at 809–10.

## II

I turn now to the substance of McDaniel's claim under Section 504 of the Rehabilitation Act. By the statute's terms, "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The analysis is the same that applies to a claim under the Americans with

Disabilities Act ("ADA"). *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012). To recover, McDaniel must prove that "(1) he is a qualified person (2) with a disability and (3) the Department of Corrections denied him access to a program or activity because of his disability." *Id.* at 672.

The dispute here is over the third element—whether McDaniel was denied access to a program or activity because of his disability. The meals that prisons make available to inmates qualify as programs or activities under the statute. *Id.* So, the question is whether a reasonable jury could find that McDaniel was denied access to meals. Under Section 504, refusing to make reasonable accommodations amounts to denying access, *id.*, but only when the result is that the qualified person cannot access programs or activities at all. *Wagoner v. Lemmon*, 778 F.3d 586, 593 (7th Cir. 2015); *see also Hildreth v. Butler*, 960 F.3d 420, 431 (7th Cir. 2020) (applying this principle in the identical ADA context). A prison's institutional prerogatives factor into whether an accommodation is considered reasonable. *Hildreth*, 960 F.3d at 431 (citing *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996)).

Considering only the facts properly before the district court, it knew that both the physical therapist and Fink observed McDaniel safely ambulate stairs. The court also knew that McDaniel was given a rationale, which was based on medical judgment, for why his placement in a no-stair unit would not have been benefited his long-term health. Taken together, these facts show the absence of a genuine dispute of material fact as to whether McDaniel required a no-stair unit to access meals. The burden therefore shifts to McDaniel, the nonmoving party, to provide evidence of specific facts creating a genuine dispute of material fact and thus precluding

summary judgment. *See Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 951 (7th Cir. 2013); *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012).

Under the facts as described *supra* section I, McDaniel did not cite any such evidence to the district court. On appeal, he relies on two portions of his deposition testimony. In the first, McDaniel testified he did not attend programs and activities at Columbia because it was "too painful" for him to walk up the stairs. And in the second, McDaniel stated he could not get up and down the stairs without assistance from other inmates.

Before the district court, though, McDaniel did not identify these passages. They are not mentioned in his responses to the defendants' proposed findings of fact, his own statement of undisputed facts, or his summary judgment brief. McDaniel did not even cite his deposition more generally, though that would have been insufficient. *See McKinney*, 866 F.3d at 808–09; *Ammons*, 368 F.3d at 817–18. Only by "scour[ing] the record," *Sojka*, 686 F.3d at 398, and "doing the work for" McDaniel by "identifying what facts [were] truly disputed," *Hinterberger*, 966 F.3d at 529, could the district court have located these portions of his deposition and analyzed their import. As noted earlier, that goes beyond what is required of district courts and of this court on appeal.

As discussed above, McDaniel was observed successfully using the stairs at Columbia more than once. Placement in a no-stair unit also would have been contrary to the medical judgment of trained professionals. The other accommodations McDaniel was given, including the cane that he was directed to use when climbing stairs, were reasonable because they permitted him to access meals and activities while also

accounting for other considerations. *See Hildreth*, 960 F.3d at 431 (reaching this conclusion about a different accommodation in the prison context).

These facts make the disposition of the no-stair theory of McDaniel's Rehabilitation Act claim straightforward. Recall that to recover, McDaniel has to prove that a no-stair unit was a reasonable accommodation, the absence of which denied him access to programs or activities. *Jaros*, 684 F.3d at 672. The refusal to adopt a specific accommodation requested by a prisoner is not a denial of access unless the prisoner cannot use the program or participate in the activity. *Wagoner*, 778 F.3d at 593. This is so even if the requested accommodation would significantly ease the inconvenience to the prisoner. *Id*.

*         *         *

Based on the facts properly before the district court, placement in a no-stair unit would not have been necessary for McDaniel to get his meals because he could safely use the stairs. No reasonable jury could conclude that the Wisconsin Department of Corrections violated the Rehabilitation Act when it declined to place McDaniel in a no-stair unit. I therefore respectfully concur in part and dissent in part.